IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EDWARD MANDEL, | § | Case No. 10-40219 |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| WHITE NILE SOFTWARE, INC., ROSA | § | |
| R. ORENSTEIN, RECEIVER, and | § | |
| MASTROGIOVANNI, SCHORSCH and | § | |
| MERSKY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. Proc. No. 12-4127 |
| | § | |
| EDWARD MANDEL, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| STEVEN THRASHER, individually and | § | |
| for WHITE NILE SOFTWARE, INC., | § | |
| JASON COLEMAN, MADDENSEWELL, | § | |
| LLP, and LAW OFFICES OF MITCHELL | § | |
| MADDEN, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. Proc. No. 12-4128 |
| | § | |
| EDWARD MANDEL, | § | |
| | § | |
| Defendant. | § | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

The Court consolidated the above-styled adversary proceedings for purposes of trial. The

Plaintiffs seek a denial of the Defendant's discharge or, in the alternative, a judgment of

nondischargeability with respect to the Defendant's obligations to the Plaintiffs. The Plaintiffs

also seek a declaratory judgment that the Defendant is the alter-ego of various non-debtor entities. The Court tried the complaints over several days and, at the conclusion of trial, took the matter under advisement in order to prepare a detailed written ruling.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. SUMMARY OF THE DISCHARGE/DISCHARGEABILITY CLAIMS

The Plaintiffs claim that the Defendant's discharge should be barred, for a number of reasons, both separately and collectively, pursuant to Bankruptcy Code §§ 727(a)(2)(A) and (B), 727(a)(3) and/or 727(a)(4). The Plaintiffs contend that the Defendant should not receive a discharge, because he denuded his bankruptcy estate through transfers among non-debtor entities, he failed to keep adequate books and records, and he made false and misleading statements to this Court regarding his income and assets. The Plaintiffs also claim, in the alternative, that all amounts which the Defendant owes the Plaintiffs should not be discharged, again on several bases. The Plaintiffs essentially contend that because of the preclusive effect of this Court's prior order allowing their claims against the Defendant for fraud, breach of fiduciary duty, and a violation of the Texas Theft Liability Act, the awards for such claims are nondischargeable under §§ 523(a)(4), (6) and/or 523(a)(2)(A). The Plaintiffs contend that their attorneys' fees are likewise nondischargeable, because they are ancillary to the primary, nondischargeable debt.

## II. PROCEDURAL HISTORY

The Defendant, Edward Mandel, filed for protection under Chapter 11 of the Bankruptcy Code on January 25, 2010. The last day to oppose Mandel's discharge or object to the dischargeability of a particular debt was 90 days after the petition date — April 23, 2010. Over

2

the next two years, the Court granted several motions by the Plaintiffs to extend the deadline and approved a stipulation among the parties, including Mandel, to extend the deadline.

On February 13, 2012, several of the Plaintiffs moved for the appointment of a Chapter 11 trustee.  The Court granted their motion following a hearing.  On June 18, 2012, the Court appointed Milo Segner as the Chapter 11 trustee in the Debtor's case.

On August 22, 2012, White Nile Software, Inc., Rosa Orenstein, as the receiver for White Nile, and Mastrogiavanni, Schorsch and Mersky ("MSM") timely filed an adversary complaint against Mandel.  The Court assigned the proceeding number 12-4127.  (The Court will refer to this proceeding as the Orenstein proceeding.)  In addition, on August 22, 2012, Steven Thrasher, individually and for White Nile, Jason Coleman, Maddensewell, LLP, and Law Offices of Mitchell Madden timely filed an adversary complaint against Mandel.  The Court assigned the proceeding number 12-4128.   (The Court will refer to this proceeding as the Thrasher proceeding.)

The Plaintiffs in the Orenstein proceeding amended their adversary complaint on November 15, 2012.  The amended complaint asserts objections to discharge under 11 U.S.C. §§ 727(a)(2), (a)(3) and (a)(4) as well as objections to dischargeability under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).

The Plaintiffs in the Thrasher proceeding amended their adversary complaint on November 14, 2012.  The amended complaint seeks a declaration of alter ego, asserts objections to discharge under 11 U.S.C. §§ 727(a)(2)(A) and (B), (a)(3) and (a)(4), and assets objections to dischargeability under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6). [1]

---

[1] On August 19, 2016, the plaintiffs in the Thrasher proceeding sought to amend their complaint to add new factual allegations.  The plaintiffs in the Thrasher proceeding also sought to amend the joint pretrial order to add supplemental disputed facts.  In particular, the plaintiffs in the Thrasher proceeding sought to establish that Mandel

On November 13, 2014, Segner moved to convert Mandel's case to Chapter 7 due to the impossibility of confirming a plan of reorganization. The Court granted the trustee's motion and entered an order converting the case to Chapter 7 on December 19, 2014. Segner remained the bankruptcy trustee when the case converted to Chapter 7. The deadline for objecting to Mandel's discharge or the dischargeability of a particular debt in the converted case was 90 days after conversion — March 13, 2015.

Prior to the trial of the adversary proceedings, the parties submitted joint pre-trial orders to the Court for each of the adversary proceedings. The only undisputed fact contained in the pretrial orders is the date of Mandel's original bankruptcy petition.[2] With this single undisputed fact in mind, and having considered the admissible evidence presented at trial, the parties' arguments at trial, and the record of the underlying bankruptcy case, including this Court's prior decisions as well as the decisions issued by reviewing courts on appeal, the Court makes the following additional findings of fact.

## III. FINDINGS OF FACT

1.      First, as a matter of background, the Court will summarize the decisions that led to the claims at issue in these adversary proceedings.

### A. Summary of the Claims of Coleman, Thrasher and White Nile

2.      The litigation between Mandel, Thrasher and Coleman arises out of the failure of White Nile. Thrasher, an intellectual property attorney, conceived of what he believed to be a new type of search engine. Mandel and Thrasher formed White Nile to develop and hold

---

had concealed assets by failing to disclose his interest in two additional entities (Vibe Micro, Inc. and 8Speed8, Inc.) and by misrepresenting another company (eFocus Solutions, Inc.) as dormant. The Court denied the motions.

[2] In a footnote to the joint pre-trial order in the Thrasher proceeding, Mandel recognized that many of the "Contested Facts listed herein have been found as facts by this Court or the United States Court of Appeals for the Fifth Circuit." Although he stated that he had "no intention of trying to re-litigate such prior findings and conclusions," Mandel explained that he "does still dispute such findings and conclusions and cannot in conscience admit them or say that he does not dispute them."

Thrasher's invention.  White Nile hired Coleman to work on a graphic representation of what the search engine would look like when complete.

3.      Mandel, Thrasher, Coleman and White Nile were engaged in litigation prior to Mandle's bankruptcy petition.  A state court had appointed Rosa Orenstein as receiver for White Nile, and Mandel had agreed to pay 52.5% of the receiver's fees.  Orenstein retained counsel, with the approval of the state court, and presented Mandel with a bill for $14,000.  Mandel refused to pay, and he filed for bankruptcy on the eve of a sanctions hearing.

4.      Coleman, individually, and Thrasher, individually and on behalf of White Nile, filed unliquidated claims in Mandel's bankruptcy case.  Mandel objected to their allowance against his bankruptcy estate.  This Court tried their claims and, on September 30, 2011, issued an opinion and order awarding $1,000,000 to Thrasher, $400,000 to Coleman, and $300,000 to White Nile  *See In re Mandel*, 2011 WL 4599969 (Bankr. E.D. Tex. Sept. 30, 2011).  In addition, the Court awarded Thrasher and Coleman their reasonable attorney's fees in the total amount of $1,500,000 ($795,000 for the Law Offices of Mitchell Madden and $705,000 for Elvin E. Smith) plus costs in the total amount of $255,989.48 ($232,308 for the Law Offices of Mitchell Madden and $23,681.48 for Elvin E. Smith).  *See id.*

5.      The facts that underlie the claims of Thrasher, White Nile and Coleman are familiar to the parties.  The Court set out the facts in detail in its September 30, 2011, decision and will not burden its present decision by repeating the facts in their entirety.  However, as relevant to these adversary proceedings, the Court made the following findings and reached the following conclusions in its prior decision:

• Mandel breached his fiduciary duties as an officer of White Nile by failing to preserve White Nile's assets.  In particular, Mandel failed to timely prosecute White Nile's patent

rights and transferred money invested in White Nile to NeXplore Corporation, among other breaches.

• In order to induce Thrasher to go into business with him, Mandel misrepresented material facts to Thrasher, such as his intent to invest $300,000 of his own funds into White Nile to develop its intellectual property.

• In order to obtain access to White Nile's intellectual property and trade secrets, Mandel fraudulently represented to White Nile that he had recruited an investor in the Philippines and that there was a team of highly qualified individuals in the Philippines working to develop White Nile's intellectual property.

• In order to induce Coleman to become a consultant for White Nile, Thrasher made numerous false and inaccurate representations to Coleman.

• Mandel breached his obligations to Thrasher and White Nile under non-disclosure agreements he entered into with them.

• Mandel conspired with others to misappropriate and use White Nile's intellectual property.

• Mandel knowingly communicated White Nile's trade secrets to NeXplore.

• Mandel knew his actions were improper, but he did not act with the requisite malice to support an award of exemplary damages.

6.      An appeal ensued.  The Fifth Circuit upheld all of the Court's material findings and conclusions and agreed that "Thrasher and Coleman did suffer some damage."  *In re Mandel*, 578 Fed. Appx. 376 (5th Cir. 2014).  The Fifth Circuit, however, remanded the issue of compensatory damages in order to allow this Court to "either conduct an additional evidentiary hearing on the issue of damages or explain its award of damages on the basis of the evidence in

the present record." *Id.* at 391.  Subsequently, on September 20, 2015, this Court entered a Memorandum Opinion and Order on Remand regarding damages and, on March 23, 2016, a Memorandum Opinion and Order on Claimants' Motion for Reconsideration.[3]

### B. Summary of the Claims of Orenstein and Her Counsel

7.      Rosa Orenstein and Mastrogiovanni, Schorsch & Mersky, P.C. ("<u>MSM</u>") also filed claims against Mandel's bankruptcy estate for their pre-petition fees and expenses in connection with the state court receivership of White Nile.  Mandel objected to the allowance of their claims.  Mandel argued among other things, that the receivership order did not require him to pay the receiver's counsel.

8.      Following trial, on March 28, 2012, the Court awarded Orenstein an allowed, unsecured claim in the amount of $315,553 for her reasonable and necessary receiver's fees incurred through December 1, 2011.  The Court also awarded MSM an allowed, unsecured claim in the total amount of $155,517 for MSM's reasonable and necessary attorneys' fees incurred through December 1, 2011.[4]

---

[3] Mandel argues that Thrasher, Coleman and White Nile do not have standing to seek denial of his discharge or a judgment of non-dischargeability, because he is appealing this Court's order allowing their claims on remand. This Court's unstayed order may be enforced according to its terms even though an appeal is pending.  The fact that this Court's order is under appeal does not deprive it of its finality or preclusive effect.  *See, e.g., Comer v. Murphy Oil USA, Inc.,* 718 F.3d 460, 467 (5th Cir. 2013) ("a case pending appeal is res judicata and entitled to full faith and credit unless and until reversed on appeal").  *See also, e.g., In re Abingdon Realty Corp.,* 530 F.2d 588, 589 (4th Cir. 1976) ("It is settled law that the filing of a petition to review an order of a bankruptcy judge (formerly a referee in bankruptcy), does not stay the effect on operation of the order unless a supersedeas bond is filed or the order itself provides for a stay.").  Notably, the Court's analysis regarding liability has been upheld on appeal, and the parties are precluded from a collateral attack on the Court's September 30, 2011 decision.  The only issue currently on appeal is the amount of compensatory damages.

[4] In the Orenstein adversary, Mandel argues that Orenstein did not have authority to retain counsel to represent her as a receiver and that Orenstein and her counsel spent too much time pursuing White Nile's claims against him. Mandel previously raised these arguments in his objections to the allowance of the claims of Orenstein and MSM. This Court discussed and considered Mandel's arguments in its decision allowing the claims of Orenstein and MSM, and his re-urging of those arguments, now, is a collateral attack on this Court's prior decision allowing the claims of Orenstein and MSM.

9.     An appeal ensued.   The district court dismissed Mandel's appeal for lack of standing.  Mandel appealed the dismissal, and the Fifth Circuit reversed and remanded the appeal to the district court.

10.     As relevant to the present adversary proceedings, the Court made the following findings of fact and conclusions of law in its March 28th decision:

• Prior to Mandel's bankruptcy, on May 29, 2009, a state court entered an agreed order appointing Orenstein as the receiver for White Nile.

• The agreed order placed Orenstein in control of White Nile's claims against Mandel, among other things.

• The agreed order provided that Mandel would pay 52.5% of the receiver's fees.

• The agreed order required Mandel to pay the fees of the receiver herself as well as the fees of any counsel she retained.

• In an order dated September 15, 2009, the state court approved Orenstein's retention of MSM as independent counsel and required Mandel to pay 52.5% of the fees of the receiver's counsel.  The state court also approved the fees of Orenstein and MSM through September 9, 2009, specifically finding their fees to be fair, reasonable and necessary.

• In the state court proceeding, Mandel claimed that he did not have the financial resources to pay his portion of all of the fees charged by Orenstein and MSM.

• In the state court proceeding, Orenstein conducted discovery regarding Mandel's financial ability to pay pursuant to orders issued by the state court.

• Orenstein testified, credibly, that she had to fight to get business and financial information from Mandel and that Mandel's business structure and finances are unusually complicated.

• Orenstein filed two motions to compel Mandel to respond to her discovery requests in the state court proceeding, and the state court ordered Mandel to comply.

### C. Summary of the Motion to Enforce Settlement Agreement

11.     While Mandel's appeals of the claims allowance orders were pending, Mandel filed a "Motion to Enforce Settlement Agreement and to Dismiss All Thrasher and Related Claims and Causes of Action."  The motion was based on a mediated settlement agreement dated September 18, 2012, arising out of state court litigation over a fee-sharing arrangement between Thrasher and Michael Shore.  (The Court will refer to this litigation as the "Thrasher/Shore litigation.")

12.     The parties to the mediated settlement agreement were "Steven Thrasher, Thrasher Associates, Steve Thrasher Associates, LLC, and all those claiming by, through or under those named above" and "Shore Deary, LLP, Shore Chan Bragalone Depumpo, LLC, Michael Shore, Judy Shore, W. Ralph Canada Jr., Jeff Bragalone, Alfonso Chan, Pat Conway and Joe DePumpo and their clients, client representatives, agents, attorneys and employees."

13.     Shore is an attorney who has represented Mandel and his business interests for many years.

14.     Mandel, White Nile and Coleman were not parties to the Thrasher/Shore litigation or the mediated settlement agreement.  The Thrasher/Shore litigation did not involve the claims by and between Thrasher, Mandel, Coleman and White Nile.  Thrasher did not represent White Nile or Mandel in the litigation.   Rather, as previously indicated, the litigation involved Thrasher's claims that the defending attorneys had not honored their obligations to Thrasher under a fee sharing arrangement.

15.     Thrasher settled his claims in the Thrasher/Shore litigation for $125,000.

16.    The mediated settlement agreement included a release of claims.   The release specifically provided:

> The parties agree to release, discharge, and forever hold the other parties harmless from any and all claims, demands or suits, unliquidated whether or not asserted in the above case, as of this date, arising from or related to the events or transactions which are the subject matter of this case.
>
> The mutual release runs to the benefit of all attorneys, agents, employees, officers, directors, attorneys, shareholders, clients, members and partners of the parties. "Party" as used in this release includes all named parties to this case as well as employees, agents, clients, client representatives, and all related entities of the parties ….

17.    In his motion to "enforce" the settlement agreement, Mandel argued that the release should be broadly construed as releasing all the claims of Thrasher and White Nile against Mandel.

18.    Thrasher, Coleman, MSM, and Orenstein objected to Mandel's motion to dismiss their claims based on the mediated settlement agreement.   They argued that this Court lacked jurisdiction to dismiss their claims in light of the pending appeals of this Court's orders.   They also argued, among other things, that White Nile was not a party to the Thrasher/Shore litigation and was not named or identified in the release.

19.    The Court heard the motion on September 4, 2013, and at the conclusion of the hearing, denied the motion.   In addition to jurisdictional concerns, the Court found as follows:

• White Nile was not a party to the Thrasher/Shore litigation.

• The claims litigation in this Court did not arise from or relate to the fee-sharing arrangement that was the subject of the dispute in the Thrasher/Shore litigation.

• Even if there was some reasonable argument that White Nile could be construed to be a claimant in the Thrasher/Shore litigation, Thrasher did not have the authority or capacity to individually waive or release White Nile's claims.

10

• However, the Court stated that its ruling was interlocutory and without prejudice to the parties to return to the state court for a determination of the enforcement of the settlement agreement.

### D. Trial of the Objections to Discharge and Dischargeability

20.     The Plaintiffs' evidence and arguments substantially overlapped.   The Court, therefore, scheduled the Thrasher proceeding and the Orenstein proceeding for trial together.

21.     At the trial, the Plaintiffs sought to establish that this Court's prior decision on the allowance of the claims of Thrasher, White Nile and Coleman, as affirmed by the Fifth Circuit, establishes all of the elements of non-dischargeability under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).  In addition, Orenstein and MSM sought to establish the non-dischargeability of their claims for fees and expenses under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).   All of the Plaintiffs also sought a judgment denying the debtor a discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(4).

22.     The Court tried these adversary proceedings over four days:  August 22, 2016, August 25, 2016, August 26, 2016, and September 22, 2016.  All of the parties appeared through counsel to present evidence and argument.  The parties also submitted legal briefs in support of their closing arguments.

23.     Although this Court has written at length about Mandel, Thrasher, Coleman, White Nile, Orenstein and MSM, the trial of the adversary complaints covered new ground relating to Mandel's income, his pre- and post-petition transfers of property and business interests, and Mandel's pre- and post-petition business interests.   The credible evidence introduced at trial establishes the following facts.

## 1. Mandel Sues Coleman and Thrasher

24.      Mandel holds an undergraduate degree in Computer Science and Master's Degree in Business Administration.   He has ownership interests in many businesses.   He testified, credibly, that he is a litigious person.   He and his businesses have been involved in many lawsuits and have retained dozens of lawyers over the years.

25.      Mandel initiated litigation against Coleman and Thrasher in 2005 in state court. The Court discussed this litigation, at length, in its decision entered on September 30, 2011.

26.      On October 17 and 19, 2007, the parties announced a tentative settlement of the state court litigation between Mandel, White Nile, Coleman and Thrasher.   The settlement involved, among other things, an agreed judgment of $900,000 against Mandel and others if Mandel failed to make payments as required under the settlement agreement.

27.      NeXplore Corporation was supposed to fund the settlement.   Mandel was the chief executive officer for NeXplore as well as the largest shareholder in the company at that time.

28.      Mandel had an indemnity agreement with NeXplore for payment of all the attorney fees and reasonable costs he might incur in the litigation involving Coleman, Thrasher, and White Nile.

29.      On December 31, 2007, Mandel filed a notice in the state court withdrawing from the settlement agreement.

30.      On January 8, 2008, Mandel executed two quit claim deeds purporting to transfer two lots from Mandel Real Estate Partners, Ltd. to the Mandel Children's 2005 Irrevocable Trust (the "Mandel Children's Trust"), a trust created in Texas in or around 2005.

12

31.     NeXplore removed the state court litigation to federal district court.  The federal district court granted the motion of Thrasher and Coleman to remand the case back to state court in May 2008.

32.     In July 2008, Mandel filed a bankruptcy petition for White Nile in the Northern District of Texas.  Mandel thereby obtained a stay of the state court litigation.  On September 16, 2008, the bankruptcy court for the Northern District of Texas granted Thrasher's motion to dismiss White Nile's bankruptcy petition.

33.     In the fall of 2008, Mandel filed a motion for partial summary judgment in the state court seeking a judgment that the settlement was unenforceable.

34.     In November 2008, Mandel signed an order agreeing to the appointment of a receiver in the state court litigation.   As previously discussed, the parties agreed to the appointment of Orenstein as receiver for White Nile in an Agreed Order Appointing Receiver entered on May 29, 2009.

## 2. Mandel Owns and Controls Many Businesses

35.     In addition to his interest in NeXplore, Mandel and his wife, Irene, each owned 50% of Positive Software Solutions, Inc. at all relevant times.  Since 2004, Positive Software has had no business other than ongoing litigation.

36.     Mandel and his wife have made all the decisions for Positive Software at all relevant times.

37.     Mandel also owned and operated Mandel Capital Partners, LP as well as Mandel Real Estate Partners prior to bankruptcy.  The general partner of each of these businesses was Mandel Management, Inc., which was owned by Mandel and his wife.

38.     Mandel Capital Partners owned approximately 13 undeveloped lots in Florida free and clear of any liens.  In addition, the assets of Mandel Capital Partners included jewelry with a value of $30,337, according to its balance sheets.

39.     Mandel Real Estate Partners owned three properties generally referred to as the Kingsgate properties.  These three properties included the two lots that were the subject of the quitclaim deeds dated January 8, 2008.

40.     Mandel formed several real estate businesses with his father, Samuel Mandel. Mandel and his father formed Mandalay Villas, Ltd. for the purpose of becoming a premier custom home builder.  Its general partner was Mandalay Construction.  Mandel's father and Mandel Capital Partners each held a 50% interest in Mandalay Construction and Mandalay Villas.

41.     Mandel, individually, owned interests in multiple tracts of real estate, including properties generally referred to by the parties as 5080 Longview, 5503 Stone Canyon, 4939 Normandy, 5653 Monteray, and 3535 Ocean Drive.

42.     Mandel lived with his wife and children in the home located at 5653 Monteray Drive when he filed for bankruptcy protection.

43.     Mandel also owned eFocus Solutions, Inc., which was a software consulting business.

44.     Mandel and his wife owned Premier Debt Recovery Centers, Inc.  Premier Debt Recover Centers owned a real estate tract located at 248 Bayshore Drive in Cape Coral, Florida. Premier Debt Recovery acquired 248 Bayshore Drive on December 30, 2008.

45.    Mandel and his wife also owned Americare Services, Inc., which was formed for the purpose of providing medical support services.  Mandel and his wife made all the decisions for Americare at all relevant times.

46.    Americare shared premises with NeXplore.

47.    Mandel hired various friends and relatives to work for Americare, including his friend, Scott Grizzle, and Vladmir Krupin, who was married to Mandel's cousin.  Krupin served as Americare's chief operating officer.

48.    Krupin testified, credibly, that Mandel sometimes backdated business documents. For example, Krupin testified, credibly, that he signed a software license agreement as the chief operating officer for Americare in September 2011, but that the agreement was dated February 15, 2010 at Mandel's request.  Mandel signed the software license agreement as the chief executive officer for Positive Software.

49.    Mandel and his companies have been involved in many lawsuits.  With respect to litigation involving NeXplore and Americare, in particular, Mandel directed counsel for Nexplore and Americare and provided them with the information counsel used to prepare documents and take legal positions.

50.    Mandel formed Zulu Ventures with Scott Grizzle.  According to Mandel, they intended for Zulu to become a holding company for future joint ventures.

51.    Prior to Mandel's bankruptcy, and in the midst of the state court litigation against Coleman and Thrasher, Mandel executed a Promissory Note dated November 15, 2008, whereby Zulu promised to pay $900,000 for stock that Mandel and his wife owned in Americare.  Zulu Ventures thereby acquired a controlling interest in Americare.  However, Zulu Ventures never made any payments on the note.

15

### 3. Positive Software Settles Litigation with New Century

52.     In 2003, Positive Software initiated litigation against New Century Mortgage Corporation and New Century Finance Corporation (collectively, "New Century").

53.     New Century filed for bankruptcy in 2007.

54.     In 2008, in the midst of the state court litigation against Coleman and Thrasher, Mandel and Positive Software settled the litigation with New Century.  They received $2 million in cash (a portion of when went to legal fees and expenses), and Positive Software was allowed two claims in the amount of $15 million each in the two New Century bankruptcy cases pending in the United States Bankruptcy Court for the District of Delaware.

### 4. The Thrasher/Shore Litigation Settles

55.     Shore represented Mandel and Positive Software in the litigation with New Century.   In the state court litigation between Thrasher and Shore over their fee sharing arrangement, Thrasher claimed, among other things, that he had referred the litigation to Shore and that Shore had failed to pay him a referral fee.

56.     As previously discussed, Mandel was not a party to the Thrasher/Shore litigation.

57.     Thrasher initiated the Thrasher/Shore litigation in 2009 (before Mandel filed for bankruptcy).

58.     In December 2012, the parties in the Thrasher/Shore litigation attended a mediation session.   At the conclusion of the session, the parties entered into a mediated settlement agreement.

59.     Thrasher settled his claims in the Thrasher/Shore litigation for $125,000.

60.     The claims Thrasher asserted against Mandel in Mandel's bankruptcy case were unrelated to the Thrasher/Shore litigation.  Further, the amount at issue in the Thrasher/Shore

litigation was far less than in Mandel's bankruptcy case. In Mandel's bankruptcy case, Thrasher asserted that Mandel owed him tens of millions of dollars.

61.     This Court's September 30, 2011, decision allowing Thrasher's individual and derivative claims against Mandel in the amount of $1.3 million was on appeal when the parties in the Thrahser/Shore litigation executed the settlement agreement.

62.     In July 2013, Mandel filed a motion in this Court seeking to "enforce" the mediated settlement agreement. Mandel asked this Court to dismiss, with prejudice, Thrasher's claims against him both individually and derivatively for White Nile based on the release contained in the mediated settlement agreement. This Court previously denied the motion for the reasons previously discussed, including the fact that the release is expressly limited to claims "arising from or related to the events or transactions which are the subject matter of [the Thrasher/Shore litigation]."

63.     In addition, if Mandel had some interest in the Thrasher/Shore litigation, the interest should have been disclosed in his bankruptcy schedules. Further, Bankruptcy Rule 9019 would have required Mandel to seek this Court's approval of the mediated settlement agreement.

64.     Mandel did not disclose any interest in the Thrasher/Shore litigation in his bankruptcy schedules, and he did not seek approval of the mediated settlement agreement from this Court.

65.     The appeal of this Court's September 30, 2011, decision proceeded to the Fifth Circuit, which upheld this Court's material findings on August 15, 2014. Mandel apparently did not raise, and the Fifth Circuit did not address, an argument that the appeal should be dismissed based on the mediated settlement agreement.[5]

---

[5] Mandel's "affirmative defense" appears to be a collateral attack on the Fifth Circuit's decision affirming this Court's decision to allow the claims of Thrasher, Coleman, and White Nile.

66.     At the trial of these adversary proceedings, Mandel asserted an "affirmative defense" that Thrasher's claims in these proceedings are barred by the mediated settlement agreement.  However, Mandel failed to establish that the language of the mediated settlement agreement encompassed Thrasher's individual or derivative claims against him.  Mandel also failed to establish that Thrasher and Shore intended to release Thrasher's individual or derivative claims against Mandel in this bankruptcy case.

### 5. Mandel Transfers Assets to the Mandel Children's Trust

67.     Meanwhile, on February 19, 2009, the state court denied Mandel's motion for a summary judgment in his favor regarding the enforceability of the settlement in the litigation involving Coleman, Thrasher and White Nile.

68.     On February 20, 2009, Mandel executed quit claim deeds relating to numerous real properties in Texas and Florida.  The properties were owned by Mandel Capital Partners, Mandel Real Estate Partners, and Premier Debt Recovery Center.  Mandel signed the deeds as the partner of Mandel Capital Partners, the director for Premier Debt Recovery Center, and the partner for Mandel Real Estate Partners.

69.     The quit claim deeds purported to transfer properties to the Mandel Children's Trust.  The Mandel Children's Trust did not provide any consideration for the properties transferred to it through the quit claim deeds.

70.     The Mandel Children's Trust did not have the funds necessary to pay taxes or other costs associated with the properties transferred to it through the quit claim deeds.

71.     Mandel chose not to record the quit claim deeds.  Mandel Capital Partners, Mandel Real Estate Partners, and Premier Debt Recovery continued to exercise all indicia of ownership of the properties, including the payment of taxes.

72.     Mandel did not intend for the properties to transfer to the Mandel Children's Trust.

73.     On October 26, 2010, Mandel executed a Mortgage Loan Renewal, Extension and Modification Agreement with Preston State Bank regarding one of the properties Mandel had transferred to the Mandel Children's Trust.   Mandel executed the document for Mandel Real Estate Partners, Ltd., and, despite his execution of a quit claim deed transferring the subject property to the Mandel Children's Trust, he represented to Preston State Bank that there had been no change in ownership of the property.   The underlying loan agreement contained an acceleration clause that would have been triggered by a change in ownership.

### 6. Mandel Agrees to the Appointment of a Receiver for White Nile

74.     On May 29, 2009, the state court entered an agreed order appointing Orenstein as receiver for White Nile in order to direct and control White Nile's claims in the state court litigation, including White Nile's claims against Mandel.   Orenstein retained MSM as her independent counsel.   On September 29, 2009, the state court entered an order approving Orenstein's designation of independent counsel.

75.     According to Mandel, NeXplore refused to indemnify him for the fees of Orenstein's counsel.  Mandel, however, controlled NeXplore and directed its litigation strategies.

76.     Mandel and his wholly-owned businesses were not paying all of their bills prior to Mandel's bankruptcy.  Mandel owed significant credit card debt and was negotiating settlements with the credit card holders.   Between July and October 2009, Mandel received foreclosure notices or notices of lis pendens on four properties owned by him or one of his wholly-owned businesses:  5653 Monteray, 4939 Normandy, 5503 Stone Canyon, and 3535 South Ocean Drive.

77.     Although Mandel and his wholly-owned businesses were not paying all of their bills, a large amount of money was flowing through Mandel's personal accounts as well as his business accounts. Between May 24, 2009 and November 1, 2009, Mandel received approximately $366,000 from NeXplore as reimbursement of expenses and approximately $280,000 as compensation.

78.     Beginning on September 26, 2009, Mandel represented to the state court that he did not have the financial resources to pay MSM's fees.  He represented to the state court that he was seeking to raise funds through non-traditional sources such as friends and family.

79.     On October 22, 2009, the amount of MSM's fees which had not been paid by Mandel pursuant to the state court's orders was approximately $14,000.00.

80.     Orenstein propounded discovery upon Mandel in an effort to determine whether he had the ability to pay her fees and the fees of MSM.  Mandel resisted responding and sought to have Orenstein removed as receiver.  The documents Mandel eventually provided in response to her requests were heavily redacted.

81.     At the same time Mandel was representing to the state court that he did not have the financial resources to pay MSM's fees, he directed NeXplore to pay the attorneys representing him and his business entities more than $120,000 for their legal services.

82.     At the trial in this Court, Mandel claimed that he meant to represent to the state court that he, personally, could not pay all of the money that was due to Orenstein and MSM.

83.     Mandel testified that his friend and business associate, Scott Grizzle, loaned him funds.  On October 27, 2009, Mandel executed a promissory note in favor of Scott Grizzle in the original principle amount of $155,000.   Grizzle sent the funds Mandel borrowed from him

directly to certain of Mandel's creditors, specifically, the secured creditors for the Stone Canyon property and the Kingsgate properties.

84.     On October 30, 2009, Mandel tendered a check to Orenstein's counsel in the amount of $5,000.  Mandel represented that he had to borrow the money from his father.

85.     On November 12, 2009, the state court specifically found that Mandel's answers to the financial discovery was evasive, obfuscative and calculated to thwart the legitimate requests of counsel as well as the order of the state court.  The state court provided Mandel the opportunity to purge his contempt of the state court's orders.

86.     On or about November 19, 2009, Mandel tendered a check to Orenstein's counsel in the total amount of $9,218.68 for the remainder of the receiver's counsel's fees that were outstanding at the time.  Mandel represented that he had to borrow the funds from his father.

87.     In November and December 2009, Mandel or his businesses transferred more than $150,000 to Scott Grizzle.  Mandel also paid a portion of the fees he, personally, owed counsel in connection with various matters.

88.     The state court set a hearing for January 25, 2010 on a motion to compel Mandel to respond to discovery requests regarding his finances.  The state court denied Mandel's request for a continuance.

89.     On January 15, 2010, Positive Software issued a check for $100,000 to Mandel and his wife.  Over the next several days, Mandel spent more than $10,000 on decorative items and sporting goods.

90.     On January 24, 2010, the day before the state court hearing, Shore deposited $400,000 into Positive Software's bank account.  These funds were the result of the settlement of a lawsuit between Positive Software and the attorneys who had represented it in the New

Century litigation.   Prior to the deposit of the settlement proceeds, the balance in Positive Software's bank account was $135.

### 7. Mandel Files for Bankruptcy

91.     On January 25, 2010, Mandel filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.  His wife, Irene, did not join him in is petition.

92.     On January 25, 2010, the same day Mandel filed for bankruptcy, Positive Software transferred $50,000 to Mandel and his wife, $35,000 to Irene Mandel, and $80,000 to Americare.

93.     Mandel filed his original bankruptcy schedules on February 8, 2010.   The property of his bankruptcy estate primarily consisted of real estate and business interests.

94.     In his original bankruptcy schedules, Mandel stated that he had $400 in cash on hand and less than $15,000 in his personal bank accounts as of the petition date.  His original schedules did not include the funds he and his wife had received from Positive Software on the petition date.

95.     As a debtor-in-possession in a Chapter 11 case, Mandel filed operating reports with this Court that disclosed his income and expenses, among other things.  He stated in his operating reports that he was including income for himself and his wife.  However, Mandel did not disclose the transfers they received from Positive Software in his bankruptcy schedules or his monthly operating reports.

96.     In his original bankruptcy schedules, Mandel disclosed and valued his stock and interests in businesses as follows:

   a.   33 million restricted shares in NeXplore (unknown value)

   b.   50% ownership interest in Zulu Ventures, LLC (unknown value)

22

    c.   49.4% ownership in Mandalay Construction, LLC ($0 value)

    d.   50% ownership interest in Premier Debt Recover Centers, Inc. ($0 value)

    e.   100% ownership interest in Positive Software Solutions, Inc. ($300,000 value)

    f.   99% ownership interest in Mandel Management, Inc. ($0 value)

    g.   100% ownership interest in eFocus Solutions, Inc. ($0 value)

    h.   52.5% ownership interest in White Nile ($0 value)

    i.   99% ownership interest in Mandel Capital Partners, LP ($959,000 value)

    j.   99% ownership interest in Mandel Real Estate Partners, LP ($289,000 value)

    k.   49.5% ownership interest in Mandalay Villas, LP ($0 value)

97.    Mandel amended his bankruptcy schedules several times.   In his most recent amendments, which he filed on February 15, 2013, Mandel disclosed a 33% ownership interest in Synergistic Technologies, which he valued at $0.  He also lowered his ownership interests in Positive Software, Mandel Management, and Mandel Capital Partners to approximately 50% as of the bankruptcy petition date.  He also lowered the value of Positive Software to $150,000 and Mandel Capital Partners to $479,000 as of the petition date.

98.    Prior to bankruptcy, Mandel and his wife used an accounting software program called "Quickbooks" to record financial information regarding their various business interests. Mandel testified that the computer where they had saved the information became corrupted in March 2012, and he was unable to restore the information.

99.    In addition to his interests in the businesses listed in his bankruptcy schedules, Mandel was providing services to other businesses, including Americare, through consulting agreements.  As previously discussed, Mandel and his wife claim to have transferred their shares

in Americare to Zulu in 2008 -- prior to Mandel's bankruptcy -- in exchange for a promissory note that Zulu never repaid.

100.    Mandel's bankruptcy schedules did not disclose a consulting agreement with Americare dated December 1, 2007.  The agreement entitled Mandel to $20,000 a month in compensation plus 5% of gross revenues.

101.    In his original bankruptcy schedules, Mandel represented that he was employed by NeXplore and was receiving $35,000 each month.  He also represented that his wife, Irene, was employed by Americare and was receiving $6,000 each month.

102.    In his original plan of reorganization filed with this Court on May 24, 2010, Mandel represented that he would cause Positive Software to contribute a significant portion of the proceeds of its claims in the New Century bankruptcy cases to be used to satisfy the claims of his creditors.

103.    Mandel amended his proposed plan of reorganization several times.  He filed his first amended plan of reorganization in September 2010.  He filed a second amended plan on January 9, 2012.  Each of these plans proposed to fund his reorganization, in part, through the proceeds of Positive Software's claims in the New Century bankruptcy cases.

104.    On January 24, 2012, a competing plan of reorganization was filed by Thrasher, MaddenSewell LLP and the Law Offices of Mitchell Madden (as partial assignee of Thrasher), and Coleman.

### 8. Mandel is Required to File Additional Reports

105.    On March 10, 2010, White Nile, Orenstein and MSM filed a motion to appoint a Chapter 11 trustee or, in the alternative, to convert Mandel's case to Chapter 7.  Thrasher and Coleman joined in the motion.

24

106.    One of the reasons posited for the need for a Chapter 11 trustee was that Mandel had not been truthful in his disclosures and bankruptcy schedules.

107.    The Court heard the motion to appoint a Chapter 11 trustee on July 14, 2010.  At the conclusion of the hearing, the Court denied the appointment of a trustee but required Mandel to include in his bankruptcy schedules approximately 20 bank accounts that he had not disclosed.  The Court also required Mandel to begin filing periodic financial reports for the business entities in which he held a substantial or controlling interest as required by Bankruptcy Rule 2015.3.

108.    Mandel filed five reports of the value, operations, and profitability of those entities in which he held a substantial or controlling interest, as required by Bankruptcy Rule 2015.3 (the "2015.3 Reports").  He filed the first two 2015.3 Reports on August 16, 2010.  He filed additional 2015.3 Reports on March 2, 2011, August 23, 2011, and March 12, 2012.

109.    In his 2015.3 Reports, Mandel repeatedly represented that Americare held more than $1.2 million in cash in its bank account.  However, Mandel knew that Americare did not have $1.2 million in cash in its bank account when he filed the reports.

110.    In his 2015.3 Reports regarding Mandel Capital Partners, LP, Mandel included "real estate lots in FL," which he valued at $854,232.  These lots were the subject of quit claim deeds to the Mandel Children's Trust, which Mandel testified that that he executed in February 2009 – prior to the time he filed the 2015.3 Reports with this Court.  Mandel's 2015.3 Reports did not disclose the existence of the quitclaim deeds.

111.    In his 2015.3 Reports regarding Mandel Real Estate Partners, Mandel included "real estate" valued at $6,050,502.  Two of the properties listed in the 2015.3 Reports for Mandel Real Estate Partners were the subject of quitclaim deeds Mandel testified that he executed in

January 2008 – prior to the time he filed the 2015.3 Reports with the Court. Mandel's 2015.3 Reports did not disclose the existence of the quitclaim deeds.

112.    In March 2012, while he was in bankruptcy, Mandel marketed and sold one of the properties that he had deeded to the Mandel Children's Trust, located at 248 Bayshore Drive in Cape Coral, Florida. The Mandel Children's Trust received net proceeds of $475,276.

113.    Although he had executed a quitclaim deed transferring the Bayshore property to the Mandel Children's Trust, Mandel included the Bayshore property as an asset of Mandel Real Estate Partners in the 2015.3 Reports he filed with this Court. Mandel did not disclose that he had sold, or was attempting to sell, the Bayshore property in any of the 2015.3 Reports, or that the proceeds would flow to the Mandel Children's Trust.

114.    After Mandel filed for bankruptcy, NeXplore assigned an interest in several patent applications to Shore Chan, a law firm that was representing NeXplore. Mandel did not include this transaction in any of the 2015.3 Reports reports he filed with this Court regarding NeXplore.

### 9. Mandel Moves Funds from Positive Software to Americare

115.    When Mandel filed for bankruptcy, his assets included an interest in Positive Software. Positive Software's most valuable assets were bankruptcy claims for $15 million against the bankruptcy estates of New Century Mortgage and for $15 million against the bankruptcy estate of New Century Finance.

116.    During Mandel's bankruptcy, Positive Software sold its bankruptcy claims to an entity specializing in the purchase of bankruptcy claims. Positive Software received $3 million in August 2010. Approximately $1.3 million of this amount went to pay legal fees that were associated with the settlement, which left approximately $1.7 million in Positive Software's bank account.

117.    On August 16, 2010, Mandel filed a "Notice of Change in Liquidity" in his bankruptcy case.  In the notice, he explained the sale of the New Century bankruptcy claims.  He stated that Positive Software would be able to contribute, if and as necessary, substantially in excess of $600,000 to Mandel's creditors.

118.    On August 16, 2010, Mandel filed his first 2015.3 Report.  His first 2015.3 Report and each of the subsequent 2015.3 Reports represented that Positive Software had more than $1.2 million in cash in its bank accounts.  This representation was false.

119.    At trial, Mandel testified that Positive Software did not have $1.2 million in cash in its bank accounts when he filed the 2015.3 Reports.  He further testified that he was aware that Positive Software did not have $1.2 million in cash in its bank accounts.

120.    After Positive Software received the proceeds from the sale of its New Century bankruptcy claims, Mandel immediately began transferring funds from Positive Software to Americare.  Mandel testified that these were purportedly loans made pursuant to a "Subordinated Convertible Debenture," or loan agreement, that he signed for Positive Software and Scott Grizzle signed for Americare.

121.    Although Mandel is a sophisticated businessman who understands that a debenture is in the nature of a promissory note, he falsely recorded the debenture as cash in Positive Software's books and records.  To the extent Mandel testified that he thought a debenture was the same as cash, his testimony was not credible.

122.    Positive Software transferred all or substantially all of its cash to Americare as part of a scheme to hide assets from Mandel's estate and to make it more difficult for creditors of the estate to reach the funds.  Americare did not repay any of the funds it allegedly borrowed from Positive Software pursuant to a debenture, or loan, agreement.

27

123.    When Mandel began transferring funds from Positive Software to Americare, he owned a controlling interest in Americare through his 50% ownership of Zulu Ventures and his (and Irene's) 100% ownership of Positive Software.  Zulu Ventures, as previously discussed, acquired a controlling interest in Americare when Mandel and his wife sold their shares in Americare to Zulu prior to Mandel's bankruptcy.

124.    Mandel controlled Americare's bank account.  After he spent all or substantially all of the funds Americare had received from Positive Software, Mandel executed a Debt Conversion Agreement.

125.    In particular, Mandel and Grizzle executed a Debt Conversion Agreement dated as of January 30, 2012.  Mandel signed the Agreement as president of Positive Software, and Scott Grizzle signed as the Chief Creative Officer for Americare.  Pursuant to the Agreement, Positive Software forgave Americare's outstanding indebtedness.  Positive Software received, in exchange, equity in Americare.

126.    In a document dated February 2, 2012, Mandel signed a resolution of the Board of Directors of Americare issuing 50 million additional shares to Grizzle.  The extra shares diluted Zulu Venture's ownership interest in Americare from 81% to approximately 25%.

127.    Mandel did not disclose the transfers from Positive Software to Americare or the changes in interest in Americare in any of the 2015.3 Reports he filed with this Court.

## 10. Mandel Transfers Patent Interests to NeXplore

128. In August 2012, counsel for NeXplore asked Mandel to execute documents assigning Mandel's interest, as the inventor, in certain patents to NeXplore. Mandel complied.[6]

129. Mandel was a debtor before this Court when he executed the assignment. However, Mandel had not listed his interest (or possible interest) in the patents as property of the bankruptcy estate, and he did not disclose the assignment to NeXplore to the Court or creditors.

130. Mandel testified at trial that believed that NeXplore, as his employer, was the rightful owner of the undisclosed patents. Mandel's testimony was not credible since, if NeXplore was the owner of the patents, no assignment from Mandel would have been necessary. Further, Mandel hid the transfers from this Court and his creditors by failing to seek authority for the post-petition assignment to NeXplore.

## 11. Mandel Uses Americare's Funds for Living Expenses

131. Prior to bankruptcy, Mandel and his wife, Irene, moved money from one entity to another, depending on which entity had money and which entity needed money.

132. Mandel operated out of two separate bank accounts while in bankruptcy. He used a debtor-in-possession, or "DIP," account. All of the transactions from the DIP account were reported in the monthly operating reports Mandel filed with this Court.

133. Mandel also operated out of an account held in Americare's name -- but which he used as his personal piggy bank. Americare's bank account was not included in Mandel's

---

[6] At trial, Mandel objected to the admission of any evidence regarding this assignment, because the assignment was not specifically mentioned in the Plaintiffs' complaints. However, a complaint objecting to discharge or dischargeability need not contain detailed factual allegations. *See* FED. R. CIV. P. 8; FED. R. BANKR. P. 7008. Here, the Plaintiffs seek, among other things, a denial of Mandel's discharge based on his dissipation of bankruptcy estate assets. The assignment of Mandel's undisclosed interest in intellectual property to NeXplore during his bankruptcy case does not create a new theory of liability, but is a fact that substantiates the Plaintiffs' complaints.

monthly operating reports.  Further, the income Mandel received from Americare's bank account was not included in Mandel's budget or his monthly operating reports filed with this Court.

134.    After Positive Software sold its New Century bankruptcy claims in August 2010, Mandel systematically transferred funds from Positive Software to Americare from August 2010 through January 2013.  Ed and Irene Mandel held debit cards for Americare's account, and they freely spent the funds transferred into the account.

135.    Mandel used Americare's bank account to pay personal expenses.  In May and June 2011, for example, Mandel paid private school tuition for his children from Americare's account.  Americare also paid for Mandel's personal vehicles during 2010 and 2011.  Americare also paid for his children's music lessons.  Americare paid Mandel's expenses when he and his family moved to Florida in 2011.  In addition, Mandel used Americare's account to pay travel and entertainment expenses, including approximately $173 for meals every two days.

136.    None of the funds Mandel transferred from Positive Software was set aside for the payment of taxes.

137.    Other than the transfers from Positive Software, Americare had no cash flow.  It had no unencumbered assets.  Its only other significant asset, if it had any value at all, was the backdated software license agreement with Positive Software.

### 12. Mandel Dilutes his Interest in NeXplore and Transfers Property to the Children's Trust

138.    On September 30, 2011, this Court issued an opinion and order with respect to Mandel's objections to the claims filed by Thrasher, on his own behalf and on behalf of White Nile, and Coleman.  The Court allowed claims against Mandel's estate in excess of $1.7 million as well as attorney's fees and costs.  All parties appealed.

139.    In November 2011, NeXplore issued one million shares of stock to Scott Grizzle. Mandel held 330,000 shares of stock.[7]  According to Mandel, the shares were worthless at that time, and Grizzle had worked for NeXplore for years without pay.  Mandel testified that Grizzle elected to convert his unpaid salary into stock.

140.    NeXplore also issued hundreds of thousands of shares of stock to Vladmir Krupin and Krupin's friend, Karen Uglets, in November 2011.  According to Mandel, they were providing consulting services to NeXplore and Americare, and NeXplore did not have the funds to pay them for their ongoing efforts with anything but stock.

141.    On February 13, 2012, White Nile, Orenstein and MSM filed a second motion to appoint a Chapter 11 trustee or, in the alternative, convert Mandel's case to Chapter 7.

142.    White Nile, Orenstein and MSM argued that a Chapter 11 trustee was warranted based on Mandel's pre-petition conduct as described in this Court's findings of fact entered on September 30, 2011, regarding Mandel's objections to the White Nile, Coleman and Thrasher's claims.  White Nile, Orenstein and MSM argued that Mandel could not confirm a plan over their objections and the objections of Thrasher and Coleman.  White Nile, Orenstein and MSM also argued that Mandel had damaged the bankruptcy estate by delaying the progress of his bankruptcy case, among other things.

143.    On February 29, 2012, Mandel filed a motion to convert his Chapter 11 case to Chapter 7.  Mandel stated in his motion that, in light of his inability to confirm a plan, he believed it was in his best interest and the best interest of his creditors to convert his case to a Chapter 7 liquidation case.

---

[7] These numbers reflect a reverse stock split that occurred in March 2012.

144.     The next day, on March 1, 2012, Mandel's brother began filing all the quit claim deeds for the properties Mandel had transferred to the Mandel Children's Trust.   Mandel's brother was the trustee for the Mandel Children's Trust.  He acted at Mandel's direction.

145.     NeXplore issued another 2 million shares to Grizzle on March 8, 2012.   With these additional shares, Grizzle's interest in NeXplore was nearly ten times the size of Mandel's interest.

146.     NeXplore's primary business at that time was prosecuting its patents.

147.     The Court continued the hearing on Mandel's motion to convert and the creditors' motion to convert or, alternatively, appoint a trustee in order to allow discovery.

148.     On June 1, 2012, the Court heard a motion by Orenstein, White Nile, and MSM for an order sanctioning Mandel for his failure to fully respond to their discovery requests. Mandel testified at the hearing.   During his testimony, Mandel disclosed the creation and filing of the quitclaim deeds.  He also disclosed the sale of the Bayshore property as well as the fact that he was attempting to sell another property, located at located at 6800 Glendenny Lane in Plano, Texas, that he had deeded to the Mandel Children's Trust.

149.     The Court heard the motions to convert or, alternatively, appoint a trustee one week later.  The Court entered its order appointing a Chapter 11 trustee at the conclusion of the hearing on June 8, 2012, hearing based, in part, on the agreement of the parties.   The Court appointed Milo Segner as the Chapter 11 trustee for Mandel's bankruptcy estate.

150.     In the midst of these hearing, as previously discussed, Mandel assigned to NeXplore certain intellectual property he claimed to have created pursuant to an assignment dated June 8, 2012.  At the time he executed the assignment, Mandel did not have Court approval to make the transfer.

### 13. The Court Appoints a Chapter 11 Trustee

151.    At the time of Segner's appointment as Chapter 11 trustee, the bankruptcy estate held approximately $26,000 in cash.

152.    Mandel did not immediately make his books and records available to Segner.

153.    Segner, as the Chapter 11 trustee, and Mandel went to mediation on July 5, 2012 with respect to the transfers to the Mandel Children's Trust.  They reached an agreement to return certain assets and filed a motion seeking approval of their agreement.

154.    On August 23, 2012, the Court heard the motion for approval of the settlement. The Court entered an order approving the settlement agreement on September 21, 2012.

155.    On September 18, 2012, this Court entered a "Supplemental Order on Appointment of Trustee."  The supplemental order expanded Segner's powers to make it clear that Segner would control Mandel's interests in Positive Software, Americare, and Zulu.

156.    In the fall of 2012, a dispute arose with the IRS regarding Mandel's 2010 tax return.  In working with the IRS regarding the tax return, Segner became aware that Mandel had been using Americare's bank account to pay his personal expenses.

157.    The IRS took the position that the bankruptcy estate got the benefit of Mandel's use of Americare's funds.  Segner took the position that the bankruptcy estate did not get any benefit, and that the income from Americare should be taxed to Mandel on his personal income tax return.

158.    Segner filed a motion to compel Mandel to turnover books and records in November 2012.  Mandel turned over some records in late 2012 in response to the motion.

159.    What Segner found made him ask for more records.   Segner retained an accountant to help him assess the assets in the bankruptcy estate.

160.     On February 7, 2013, Segner filed a state court lawsuit seeking injunctive relief and a receivership for the benefit of Americare and Zulu.  The state court appointed a receiver on the same day.  At that time, Americare was insolvent and the stock owned by Positive Software on account of the convertible debenture was devoid of value.

161.     Ultimately, Segner, the state court receiver, and the defendants in the state court lawsuit mediated and settled the matter.  The settlement structure was the sale of the bankruptcy estate's interest in, *inter alia*, Americare and Positive Software to Mandel's business associate, Igor Chavenetz, for the sum of $265,000.   The bankruptcy estate received approximately $215,000 after paying the costs of the state court receiver.

162.     In August 2014, Segner re-filed Mandel's tax return for 2010.  The IRS initially assessed a large administrative claim against the bankruptcy estate based on the way Mandel moved money from Positive Software through Americare and then into his own hands, among other issues.  After negotiations with Segner and extensive examination of Mandel's tax returns, the IRS amended and reduced its claim against the bankruptcy estate.

163.     At the trial of these adversary proceedings, Segner testified that "Mr. Mandel was a gentleman."   He also testified that Mandel only provided him with bits and pieces of information and that getting information from him was like "pulling teeth."

164.     Mandel did not make Segner or his accountant aware of any assets that were not recorded in Mandel's books and records.  To the extent Mandel testified that he orally advised Segner of unrecorded assets, his testimony was not credible.

165.     Among other things, Mandel did not disclose his post-petition assignment of intellectual property to NeXplore or the security agreement between NeXplore and Shore Chan. Mandel also failed to disclose his interest in several new ventures in which he was involved.[8]

166.     On November 13, 2014, Segner moved to convert the case to Chapter 7 due to the impossibility of confirming a plan of reorganization.  The Court granted Segner's motion and entered an order converting the case to Chapter 7 on December 19, 2014.  Segner remained the trustee when the case converted to Chapter 7.

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction

1.     This Court has authority to enter a final judgment in this adversary proceeding, as it constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (I) and (J) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

### B. Objections to Discharge

2.     As an initial matter, Mandel argues that the Orenstein adversary objecting to his discharge is barred by the doctrine of *volenti non fit injuria* – more commonly known as assumption of the risk.  He argues that Orenstein and MSM incurred "massive" fees without any reasonable expectation of payment.  He further argues that since they assumed the risk of non-payment, they should not be allowed to block Mandel's discharge.

3.     At federal common law, assumption of the risk arises out of the knowing and voluntary acceptance of a dangerous condition.  *See Seaboard Air Line Ry. v. Horton,* 233 U.S. 492, 504–05 (1914).[9]

---

[8] With the enactment of Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23 (2005), an individual chapter 11 debtor's estate includes post-petition property and earnings, and, under certain conditions, an individual chapter 11 debtor may need to devote his or her projected disposable income for five years to repay creditors. 11 U.S.C. §§ 1115(a) and 1129(a)(15).

4.      Assumption of risk is not, however, available as a defense in a contract action. *See, e.g., Underwriters at Lloyd's v. Peerless Storage Co.,* 404 F.Supp. 492, 495 (S.D. Ohio 1975), *aff'd* 561 F.2d 20 (6th Cir.1977) (assumption of risk defense not available in contract action).

5.      Here, as described in this Court's order allowing the claims of Orenstein and MSM, Mandel agreed to Orenstein's appointment as receiver.  Thrasher was obligated to pay 47.5% of the receiver's fees, and Mandel was obligated to pay the balance pursuant to the terms of the agreed receiver order.

6.      An agreed order, like a consent decree, is in the nature of a contract.  *Thomasville Furniture Indus., Inc. v. Elder–Beerman Stores,* 250 B.R. 609, 635 (S.D. Ohio 1998).  *See also In re 360 Inns, Ltd.,* 76 B.R. 573, 578 (Bankr. N.D. Tex. 1987) ("[A]n agreed order is in the nature of a contract and is subject to the rules of construction of contracts.").

7.      Thrasher honored his obligations under the agreed receiver order, and Orenstein received $380,000 from Thrasher during the pendency of Mandel's bankruptcy case.

8.      Mandel was obligated to pay the balance of the receiver's reasonable fees pursuant to the agreed receiver order.  However, prior to bankruptcy, Mandel claimed poverty. Mandel resisted the receiver's attempts to obtain and examine his financial records.

9.      As previously discussed, Mandel objected to the allowance of the claims of Orenstein and MSM in his bankruptcy case.  This Court did not allow the full amount of the claims.  The Court allowed the claims in a reduced amount based on some of the objections raised by Mandel.

---

[9] The common law affirmative defense of assumption of the risk no longer exists under Texas law.  *Austin v. Kroger Texas, L.P.,* 465 S.W.3d 193, 209–10 (Tex. 2015).  Proportionate responsibility abrogated former common law doctrines that barred a plaintiff's recovery because of the plaintiff's conduct—like assumption of the risk—in favor of submission of a question on proportionate responsibility. *Del Lago Partners, Inc. v. Smith,* 307 S.W.3d 762, 772 (Tex. 2010).

10.     Orenstein's fees would undoubtedly have been higher but for the fact that Thrasher asserted duplicative, derivative claims against Mandel on behalf of White Nile.  In light of the fact that Orenstein's claims duplicated Thrasher's claims on behalf of White Nile, as well as the existence of a significant risk that Orenstein would not be paid, this Court allowed Orenstein to abstain from appearing at the trial of White Nile's claims against Mandel without breaching her fiduciary duties as receiver for White Nile.

11.     Even assuming the defense of "assumption of the risk" applies to the enforcement of agreed orders, the Court concludes that Mandel failed to establish that Orenstein and MSM knowingly and voluntarily accepted the risk of nonpayment.  Indeed, Orenstein and MSM attempted to mitigate the risk of nonpayment by abstaining from the claims allowance proceeding.  It appears to the Court that Mandel's own conduct created the risk of non-payment during the course of the state court litigation and the pendency of his bankruptcy case.

**C. Objections to Discharge Under §727**

12.     The Plaintiffs object to Mandel's discharge under 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B),[10] 727(a)(3) and 727(a)(4).

13.     The Bankruptcy Code requires that a debtor be granted a discharge unless one of the statutory grounds for denial of that discharge is proven.  *See* 11 U.S.C. § 727(a).

14.     To fulfill the statutory policy of providing a debtor with a "fresh start," the provisions of § 727(a) are construed strictly against parties seeking to deny the granting of a debtor's discharge and liberally in favor of a debtor.  *Laughlin v. Nouveau Body & Tan, L.L.C.*

---

[10] At trial, and in his general objection to virtually everything in the parties' joint pretrial orders, Mandel argued that the Plaintiffs had not raised claims under § 727(a)(2)(B) in their adversary complaints.  However, the claim is set forth in Count II of the amended complaint in adversary 12-4128, which was filed on November 14, 2012.  The amended complaint in adversary 12-4127, which was filed on November 15, 2012, cited generally to § 727(a)(2), and included allegations regarding post-petition activities that form the basis for a § 727(a)(2)(B) claim in that proceeding.  For example, paragraphs 57-69 of the complaint in adversary 12-4127 detail Mandel's alleged scheme to hide assets from the bankruptcy estate through non-disclosure of the transfers among the non-debtor entities he controlled.  Thus, the Plaintiffs' claims under § 727(a)(2)(B) were timely asserted in their complaints.

*(In re Laughlin)*, 602 F.3d 417, 421 (5th Cir. 2010); *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 356 (Bankr. N.D. Tex. 2010).

15.     The denial of a debtor's discharge is considered a harsh and extreme remedy. *McDermott v. Crabtree*, 554 B.R. 174, 191 (Bankr. D. Minn. 2016); *Res-TX One, LLC v. Hawk (In re Hawk)*, 534 B.R. 697, 719 (Bankr. S.D. Tex. 2015).

16.     Courts should deny discharge only for very specific and serious infractions. *Lowry v. Croft (In re Croft),* 500 B.R. 823, 857 (Bankr. W.D. Tex. 2013) (citing *Ichinose v. Homer Nat'l Bank (In re Ichinose),* 946 F.2d 1169, 1172 (5th Cir. 1991)).

17.     A denial of a debtor's discharge "is a blunt remedy for actions that hinder the entire bankruptcy process," *Husky Int'l Elec., Inc. v. Ritz*, ──U.S. ──, 136 S.Ct. 1581, 1589, 194 L.Ed.2d 655 (2016).  A denial of discharge is to be imposed only upon those debtors who have not been honest and forthcoming about their affairs and therefore have not fulfilled the duties of full disclosure required of a bankruptcy debtor.  *Buckeye Retirement Properties v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006) ("The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor.").

18.     Thus, speculation and surmise about the existence of such misconduct are insufficient.  Probative evidence must be presented.

19.     Actions under § 727 are governed by Federal Rule 8(a)(2), which provides that a plaintiff's complaint objecting to discharge must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As explained by the Fifth Circuit, complaints "'must contain either direct allegations on every material point necessary to sustain a recovery ... or contain allegations from which an inference fairly may be drawn that evidence on these

material points will be introduced at trial.'"  *Campbell v. City of San Antonio*, 43 F. 3d 973, 975 (5th Cir. 1995). [11]

20.     At trial, a plaintiff bears the burden of proving that the defendant is not entitled to a discharge under § 727.  The standard of proof for its claim is a preponderance of the evidence. *Cadle Co. v. Duncan (In re Duncan),* 562 F.3d 688, 695 (5th Cir. 2009); *Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir. 1992).

### 1. §727(a)(2)(A): Transfer or Concealment of Property

21.     Section 727(a)(2)(A) provides:

> The court shall grant the debtor a discharge unless—the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ... has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—property of the debtor, within one year before the date of the filing of the petition. ...

22.     In order to establish grounds for denial of a discharge under §727(a)(2)(A), a plaintiff must demonstrate by a preponderance of the evidence that there was:

> (1) a transfer or concealment of property;
> (2) belonging to the debtor;
> (3) within one year of the filing of the petition; and
> (4) performed with an intent to hinder, delay or defraud a creditor or an officer of the estate.

*Judgment Factors, LLC v. Packer ( In re Packer)*, 816 F.3d 87, 92–93 (5th Cir. 2016); *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989).

---

[11] At trial, a dispute arose regarding the admissibility of facts not specifically alleged in the Plaintiffs' adversary complaints.  The disputed facts included facts relating to post-petition business ventures Mandel had not disclosed to Segner or his creditors.  The Plaintiffs argued that they were showing a pattern of conduct that further established their §727 causes of action.  Mandel argued that the Plaintiffs were, in fact, raising new theories of liability long after the deadline for objecting to his discharge and on the eve of trial.  *See In re Riggert*, 399 B.R. 453, 460–62 (Bankr. N.D. Tex. 2009).  The Court admitted some of the evidence concerning Mandel's post-petition business ventures for purposes of impeachment during trial.

23.     The second requirement for denying a discharge under §727(a)(2) is that the property which is transferred, concealed or removed must be property of the debtor or property of the estate.

24.     "Under the second element of §727(a), a relevant concealment can occur only if property of the debtor is concealed." *Cadle Co. v. Friedheim ( In re Friedheim)*, 277 Fed.Appx. 485, 489 (5th Cir. 2008).

25.     As one court has described this requirement,

> According to the plain language of the statute, there must be a disposition of "property of the debtor."  Relying on this language, courts have recognized that section 727(a)(2)(A) is concerned with the disposition of property in which the debtor has a "direct proprietary interest."  Therefore, section 727(a)(2)(A) does not apply when the disposition involves property belonging to someone, or some entity, other than the debtor, even if the transfer may cause an incidental effect upon the debtor's assets. ...  When a corporation is a bona fide entity distinct from an individual debtor-shareholder, courts have applied the above-stated principle to hold that transfers of property belonging to the corporation are outside the scope of section 727(a)(2)(A).

*Wachovia Bank, N.A. v. Spitko (In re Spitko),* 357 B.R. 272, 299 (Bankr. E.D. Pa. 2006) (citations omitted).

26.     Here, the Plaintiffs complain that Mandel's discharge should be denied pursuant to §727(a)(2)(A), because he made cash payments and transfers of real property to the Mandel Children's Trust, friends, and family members within one year of the petition date with the intent to hinder, delay or defraud his creditors.  The Plaintiffs also complain that Mandel's discharge should be denied pursuant to §727(a)(2)(A) because he converted cash from one entity to another while receiving no or worthless consideration within one year of the petition date, thereby diluting or destroying the value of his interest in these companies, with the intent to hinder, delay or defraud his creditors.

27.    Mandel responds that the disputed transfers were made by non-debtor entities, and none of the disputed transfers involved property of the bankruptcy estate.

28.    The Plaintiffs argue that this Court should pierce the corporate veils and find that Mandel was the alter ego of the relevant non-debtor entities that he owned and controlled.  Thus, the Plaintiffs seek to retroactively classify the assets of the non-debtor entities as property of Mandel's bankruptcy estate.

29.    "A debtor who is a shareholder in a corporation will not be denied a discharge based on transfer of or injury to corporate property.  The plaintiff has the burden to establish that the property is property of the estate.  It is not because the debtor/shareholder is not the owner of property of the corporation.  The property interest of the debtor and the debtor's estate is limited to the stock certificates."  *BankUnited, N.A. v. Lehmann (In re Lehmann),* 511 B.R. 729, 735 (Bankr. M.D. Pa. 2014).

30.    "Property owned by a corporation of which the debtor is a shareholder does not constitute property of the debtor's bankruptcy estate. [Such] properties were not required to be disclosed by the debtor in his schedules, and it is therefore difficult to see how any fraud or other act leading to denial of discharge arose by this over-inclusion." *Manning v. Watkins (In re Watkins)*, 474 B.R. 625, 649 (Bankr. N.D. Ind. 2012) (citing *Fowler v. Shadel*, 400 F.3d 1016, 1019 (7th Cir. 2005)).

31.    Although disclosure is not required in the schedules, Bankruptcy Rule 2015.3 requires a debtor to file reports of the value, operations and profitability of those entities in which he holds a substantial or controlling interest.  As discussed below, Bankruptcy Rule 2015.3 reports, like bankruptcy schedules, are signed under penalty of perjury.  *See* Official Bankruptcy Form 26, available at http://www.uscourts.gov/services-forms/forms.

32.     "In order to justify the refusal of discharge under a section 727(a)(2) transfer, it must be shown that there was an actual transfer of valuable property *belonging to the debtor* which reduced the assets available to creditors and which was made with fraudulent intent." *Id.* at 633 (emphasis added) (citing *Lee Supply Corp. v. Agnew (In re Agnew)*, 818 F.2d 1284, 1287 (7th Cir. 1987)).

33.     Here, the Plaintiffs' §727(a)(2)(A) claim involving transfers by Mandel within one year of the petition date fail.  Even assuming the Mandel's Children's Trust and the various non-debtor businesses operated by Mandel were his alter ego, no transfers of estate property occurred.  As recently explained by Judge Parker in *In re Ward*, 557 B.R. 508, 515–16 (Bankr. N.D. Tex. 2016):

> To understand this conclusion, one must consider the legal effect of an alter ego finding under Texas law, which is far from clear. After reviewing the relevant jurisprudence, however, it appears that an alter ego finding can have one of two outcomes under Texas law: (1) the entities are no longer legally separate and all assets of the non-debtor entity are retroactively reclassified as property of the Debtor or the bankruptcy estate (this is the outcome posited by the Plaintiffs), or (2) the assets of the non-debtor entity may become liable for the payment of a specific debt owed by the Debtor (because alter ego is a remedy to assist in the collection of a proven debt against the Debtor), but the Debtor and the non-debtor remain legally distinct entities. Under the first alternative, and as alleged by the Plaintiffs in the Complaint, WFT's assets would be considered property of the Debtor retroactively. Because of this, no improper transfer could have occurred as a transfer from WFT to the Debtor, or vice versa, would be a transfer from the Debtor to himself. Under the second alternative, where the assets of the non-debtor may become liable for payment of a debt of the Debtor but the Debtor and the alter ego non-debtor remain legally distinct, the funds transferred by the non-debtor within the year prior to the Debtor's bankruptcy filing were never the Debtor's property and thus an element of a §727(a)(2)(A) claim cannot be established—*i.e.*, no property of the Debtor was transferred. Thus, even assuming the summary judgment record establishes the existence of genuine issue of material fact that the Debtor and WFT are alter egos of each other as the Plaintiffs allege, the §727(a)(2)(A) allegations involving WFT fail as a matter of law.

34.     Here, as in *Ward*, the transfers were either transfers Mandel made to himself, or the transfers did not involve property of the bankruptcy estate.

35.    Because the Plaintiffs failed to sustain their burden of proof to show by a preponderance of the evidence that Mandel transferred, removed or concealed any individually-owned property within a year of his bankruptcy filing with an actual intent to hinder, delay or defraud creditors, the relief sought by the Plaintiffs under §727(a)(2)(A) must be denied.

### 2. §727(a)(2)(B): Post-Petition Transfer or Concealment of Property

36.    The Plaintiffs also seek to deny Mandel's discharge pursuant to 11 U.S.C. §727(a)(2)(B).  Section 727(a)(2)(B) of the Bankruptcy Code provides:

> The court shall grant the debtor a discharge unless— the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ... has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—property of the estate, after the date of the filing of the petition. ...

37.    In order to establish grounds for denial of a discharge under §727(a)(2)(B), a plaintiff must demonstrate by a preponderance of the evidence that there was:

(1) a transfer, removal, destruction, mutilation, or concealment of property;
(2) belonging to the estate;
(3) after the bankruptcy petition was filed; and
(4) performed with an intent to hinder, delay or defraud a creditor or an officer of
    the estate.

*A&M Invs., LLC v. Kirtley (In re Kirtley)* 533 B.R. 154, 163 (Bankr. S.D. Miss. 2015).  *See also Schmidt v. Cantu (In re Cantu)*, 2011 WL 672336, at *11 (Bankr. S.D. Tex. Feb. 17, 2011).

38.    The second requirement for denying a discharge under §727(a)(2)(B) is that the property which is transferred, concealed, or removed is required to be property of the bankruptcy estate.  *Cadle Co. v. Friedheim (In re Friedheim)*, 277 Fed.Appx. 485, 489 (5th Cir. 2008); *Gebhardt v. McKeever (In re McKeever)*, 550 B.R. 623, 636 (Bankr. N.D. Ga. 2016).

39.     "The debtor must have more than a mere *derivative interest* in the property ... [it must have] a *direct* propriety interest." *McKeever,* 550 B.R. at 635 (citing *Ne. Neb. Econ. Dev. Dist. v. Wagner (In re Wagner)*, 305 B.R. 472, 475 (8th Cir. BAP 2004)) (emphasis in original).

40.     Here, the Plaintiffs complain that Mandel's discharge should be denied pursuant to §727(a)(2)(B) because he made cash payments and transfers of real property to the Mandel's Children's Trust, friends, and family members during the pendency of his bankruptcy case with the intent to hinder, delay or defraud his creditors.  The Plaintiffs also complain that Mandel's discharge should be denied pursuant to §727(a)(2)(B) because he transferred cash from one entity to another in exchange for no or worthless consideration, thereby diluting or destroying the value of his interest in these companies during the pendency of his bankruptcy case, with the intent to hinder, delay or defraud creditors.

41.     Mandel responds that the challenged post-petition transfers were made by and between non-debtor entities and none of the transfers involved property of the estate.

42.     For the reasons discussed in connection with the Plaintiffs' claims under §727(a)(2)(A) of the Bankruptcy Code, their claims under §727(a)(2)(B) also fail.  No transfer of estate property occurred.

43.     Because the Plaintiffs have failed to sustain their burden of proof to show by a preponderance of the evidence that Mandel transferred, removed or concealed any property belonging to his bankruptcy estate after the entry of the order for relief with an actual intent to hinder, delay or defraud creditors, the Court must deny the relief sought by the Plaintiffs under §727(a)(2)(B).

### 3. §727(a)(3): Failure to Keep and Preserve Financial Records

44.     The Plaintiffs also seek to deny Mandel's discharge pursuant to 11 U.S.C. §727(a)(3).  Section 727(a)(3) of the Bankruptcy Code provides:

> The court shall grant the debtor a discharge unless—the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transaction might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

45.     Thus, a discharge is denied to an individual debtor under §727(a)(3) for a failure to keep or preserve documentation from which creditors can ascertain his financial condition and determine the nature of his financial dealings.

46.     "Individuals who desire the privilege of a discharge are required to provide their creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial accuracy for a reasonable period past to present.  Section 727(a)(3) is intended to allow creditors and/or the trustee to examine the debtor's financial condition and determine what has passed through a debtor's hands.  It serves as a limitation upon a debtor's right to a discharge because creditors are not required to risk having the debtor withhold or conceal assets under the cover of a chaotic or incomplete set of books or records." *Neary v. Guillet (In re Guillet),* 398 B.R. 869, 888 (Bankr. E.D. Tex. 2008) (citations and internal quotations omitted).  *See also, Hughes v. Wells (In re Wells),* 426 B.R. 579, 594 (Bankr. N.D. Tex. 2006) (finding that, though an impeccable system of bookkeeping is not required, "creditors should not be required to speculate about the financial condition of the debtor or hunt for the debtor's financial information."); *Stapelton v. Yanni (In re Yanni),* 354 B.R. 708, 712 (Bankr. E.D. Pa .2006) (noting that §727(a)(3) "ensures that creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history.").

45

47.     Under §727(a)(3), a plaintiff must prove that a debtor: (1) failed to keep and preserve financial records; and (2) that this failure prevented the plaintiff from ascertaining the debtor's financial condition. *Robertson v. Dennis (In re Dennis),* 330 F.3d 696, 703 (5th Cir. 2003).  Intent is not an element.

48.     The premise of this subsection is that such financial documents would have been available under normal circumstances except for the failure of the debtor to maintain or preserve them.   If this evidentiary burden is sustained, the burden shifts to the debtor to show the inadequacy is justified under all of the circumstances.   The Fifth Circuit has never delineated a precise threshold beyond which a debtor becomes accountable for further recordkeeping.   A debtor's financial records need not contain "full detail," but there should be written evidence of the debtor's financial condition.  *Guillet,* 398 B.R. at 889 (citing *Cadlerock Joint Venture, L.P. v. Sauntry (In re Sauntry),* 390 B.R. 848, 855 (Bankr. E.D. Tex. 2008) (citations and quotations omitted)).

49.     "The financial records a debtor maintains should be appropriate and reasonable for a debtor of similar sophistication." *Wells,* 426 B.R. at 594.  In sum, the Court must deny a discharge under §727(a)(3) if the Plaintiff can demonstrate that each Defendant failed to keep records or "to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate."  *Randall v. Atkins (In re Atkins),* 458 B.R. 858, 873 (Bankr. W.D. Tex. 2011).

50.     Here, Mandel failed to maintain accurate records regarding the assets of businesses he owned and controlled.   For example, prior to bankruptcy, Mandel falsified the books and records of several of his businesses by omitting the execution of quit claim deeds to the Mandel Children's Trust, and he did not record the deeds publicly.   Prior to bankruptcy,

46

Mandel also back-dated business documents to suit his needs, making it difficult or impossible to analyze the substance of some of his business dealings.

51.    Mandel and his wife moved money from one entity to another, depending on need, without keeping records of the transactions.

52.    During bankruptcy, Mandel failed to disclose or keep accurate records regarding his transfers of funds from Positive Software to Americare to himself to pay his personal expenses.  Mandel failed to keep and disclose records regarding the income he received from Americare.  He also falsely recorded that Positive Software had approximately $1.2 million in cash in its bank account.

53.    Mandel's early operating reports included an account receivable for $1.2 million. This entry was not included in Mandel's operating reports after September 2010.  Mandel failed to provide credible testimony or other evidence explaining the entry or its disappearance.

54.    Mandel's testimony that he lost important business records during bankruptcy due to the corruption of his computer was not credible.  Mandel was not keeping adequate records of his business transactions before or after the alleged problem with his computer.

55.    Mandel did not disclose that eFocus still owned domain names when he filed for bankruptcy.  Mandel kept no records showing the value, if any, of the domain names owned by eFocus on the petition date.

56.    In his bankruptcy case, and at the trial of these adversary proceedings, Mandel represented that eFocus was dormant with no assets on the petition date because its interest in any domain names had expired or lapsed.  This representation was false.  During Mandel's bankruptcy case, eFocus transferred domain names to Mandel's relatives.  Mandel had owned eFocus for many years and actively controlled its business, and his testimony that he did not

understand how the allegedly lapsed domain names could have been transferred from eFocus to his relatives was not credible.

57.     Before and during his bankruptcy, Mandel engaged in a pattern of obfuscating his financial condition by failing to keep or record adequate records and by deliberately misrepresenting the assets and value of his businesses.

58.     The evidence presented by the Plaintiffs is sufficient to fulfill their burden to demonstrate under §727(a)(3) that Mandel failed to keep and preserve financial records with regard to the dissipation of the assets of entities in which he had a substantial or controlling interest.  The Plaintiffs also demonstrated that such failure prevented them from ascertaining his financial condition.  *Dennis,* 330 F.3d at 703.

59.     Mandel is a sophisticated and educated businessman.  He failed to satisfy his burden to show that the inadequacy of the records he kept was justified under the circumstances.

60.     Because the Plaintiffs sustained their burden of proof to show by a preponderance of the evidence that Mandel failed to keep or preserve financial records, and this failure prevented them from ascertaining his true financial condition, the relief sought by the Plaintiffs under §727(a)(3) must be granted.

**4. §727(a)(4): False Oaths**

61.     The Plaintiffs also seek to deny Mandel's discharge pursuant to 11 U.S.C. §727(a)(4)(A).  In their adversary complaints, and in the parties' joint pre-trial order, the Plaintiffs complain that Mandel omitted assets from his bankruptcy schedules and filed materially false 2015.3 reports with this Court.

62.     Section 727(a)(4)(A) of the Bankruptcy Code provides:

> The court shall grant the debtor a discharge unless—the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account ....

48

63.     "The purpose of §727(a)(4)(A) is to enforce a debtor's duty of disclosure and to ensure that the Debtor provides reliable information to those who have an interest in the administration of the estate.  Thus, complete financial disclosure is a condition precedent to the privilege of discharge."  *Lindemann,* 375 B.R. at 469 (citations and quotations omitted).

64.     "False oaths sufficient to justify the denial of discharge include: (1) a false statement or omission in the debtor's schedules; or (2) a false statement by the debtor at the examination during the course of the proceedings."  *Beaubouef,* 966 F.2d at 178.

65.     "The bankruptcy schedules prepared by a debtor ensure that adequate information is available to the trustee and creditors without the need for investigation to determine whether the information provided is true."  *Osherow v. Charles (In re Wolf)*, 2016 WL 4940198, at *45 (Bankr. W.D. Tex. Sept. 15, 2016) (citing *Pratt*, 411 F.3d at 566).

66.     As the objecting parties, the Plaintiffs carry the burden of proof under §727(a)(4)(A) and must demonstrate by a preponderance of evidence that:

(1) the debtor made a statement under oath;
(2) the statement was false;
(3) the debtor knew the statement was false;
(4) the debtor made the statement with fraudulent intent; and
(5) the statement materially related to the bankruptcy case.

*Packer,* 816 F.3d at 94; *Duncan,* 541 F.3d at 695.

67.     If a plaintiff establishes a *prima facie* case that a debtor made a materially false statement, then the burden shifts to the debtor to present evidence that he or she is innocent of the charged offense. *Id.* at 696.

68.     A plaintiff in a §727(a)(4)(A) action must demonstrate by a preponderance of the evidence an actual intent to hinder, delay, or defraud creditors—a constructive intent is insufficient.  *Harwood*, 404 B.R. at 384 (citing *Chastant,* 873 F.2d at 91).

69.     In most circumstances only the debtor can testify directly concerning his or her intent and "rare will be the debtor who willingly provides direct evidence of a fraudulent intent." *Neary v. Darby (In re Darby)*, 376 B.R. 534, 541 (Bankr. E.D. Tex. 2007). Instead, the existence of a fraudulent intent is most often betrayed by an examination of a course of conduct. *Id.; see First Tex. Savings Assoc. v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir. 1989).

70.     Thus, "[f]raudulent intent may be proved by showing either actual intent to deceive or a reckless indifference for the truth." *Neary v. Hughes (In re Hughes)*, 353 B.R. 486, 504 (Bankr. N.D. Tex. 2006); *see Sholdra v. Chilmark Fin., LLP (In re Sholdra)*, 249 F.3d 380, 382-83 (5th Cir. 2001).

71.     "A debtor's reckless indifference to the truth is sufficient to deny the debtor a discharge if the subject matter of the omission is material to the administration of the bankruptcy." *Bishop v. Kinard (In re Kinard)*, 518 B.R. 290, 305 (Bankr. E.D. Pa. 2014).

72.     A false statement or omission is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 692 (Bankr. E.D. Tex. 2009) (citing *Duncan*, 562 F.3d at 695).

73.     Here, Mandel omitted financial information from his operating reports as well as the budget he filed with this Court by failing to disclose the income he was receiving from Americare.  He did not disclose his use of Americare's funds to pay personal expenses, such as school tuition for his children and car payments.  He failed to include or account for the funds he and his wife received from Positive Software on the eve of his bankruptcy.  He also did not

disclose the quit claim deeds he had executed to the Children's Trust, thereby falsely inflating the value of his interests in the businesses that had executed the quit claim deeds.

74.     Mandel intentionally omitted any income he was receiving from his various businesses in the form of payments of his personal expenses. Mandel hid income by having his businesses pay his bills and then he intentionally hid those transactions by failing to disclose them or keep records of them (other than bank statements). Mandel's omissions and misrepresentations were material to his bankruptcy case.

75.     Mandel also made numerous false statements to this Court in the reports he filed with this Court pursuant to Bankruptcy Rule 2015.3.

76.     Bankruptcy Rule 2015.3 is a relatively new Bankruptcy Rule.

77.     Section 419(a) of the Bankruptcy Abuse and Consumer Protection Act of 2005 ("BAPCPA") required the Judicial Conference of the United States to propose amended Bankruptcy Rules and prescribe official forms that would require Chapter 11 debtors in possession and Chapter 11 trustees to file periodic reports with information concerning the value, operations, and profitability of any closely held corporation, partnership or other entity in which the Chapter 11 debtor holds a "substantial or controlling interest." Pub. L. No. 108-9, § 419(a) (2005). Section 419 was intended to provide "more complete information regarding assets of the estate." Pub. L. No. 108-9, § 419(b) (2005). The statute's stated purpose is to assist parties in ensuring that the debtor's interest in entities in which the debtor holds a substantial or controlling interest "is used for the payment of allowed claims against the debtor." *Id.*

78.     The new Bankruptcy Rule 2015.3 requires a Chapter 11 debtor in possession to file periodic reports of value, operations, and profitability of each entity in which the bankruptcy estate holds a substantial or controlling interest. FED. R. BANKR. P. 2015.3(a). "An entity of

51

which the estate controls or owns at least a 20 percent interest, shall be presumed to be an entity in which the estate has a substantial or controlling interest." FED. R. BANKR. P. 2015(b).   The report must be filed with the court on Official Form 26, and the information must be the most recent information available. *Id*.

79.    The first report is due not later than seven days before the first date set for the meeting of creditors, and subsequent reports must be filed at least every six months. FED. R. BANKR. P. 2015(b).   An "unexcused failure" to make such a report may be cause for conversion or dismissal of the chapter 11 case. *See* 11 U.S.C. §1112(b)(4)(F).

80.    Here, the 2015.3 reports Mandel filed with this Court were signed under penalty of perjury and had the force and effect of oaths. *See*, *e.g., In re Korte*, 262 B.R. 464, 474 (8th Cir. BAP 2001) ("Statements made in schedules are signed under penalties of perjury and have 'the force and effect of oaths,' ….").   Nonetheless, Mandel failed to disclose the transfers of real property to the Children's Trust in his reports.   He falsely represented that Positive Software was holding $1.2 million in cash.   He failed to disclose that Positive Software was not holding $1.2 million in cash, but, instead, had transferred the funds to Americare in exchange for a debenture.

81.    Like his bankruptcy schedules and 2015.3 reports, the monthly operating reports Mandel filed with this Court during his Chapter 11 case were signed under penalty of perjury and had the force and effect of oaths.   In his monthly operating reports.   Mandel falsely reported that his only income was from NeXplore.   Mandel, in fact, was using funds from Americare to pay his living expenses.

82.    Mandel's false statements were willful and intentional.   Mandel understood the relevant accounting principles as well as the bankruptcy requirements.   He intended to conceal

his financial activities and deceive his creditors, this Court, and his own attorneys regarding his financial situation.

83.     Mandel's false statements related materially to his bankruptcy case.  As a result of Mandel's omissions, creditors and the Court could not accurately and timely gauge his financial situation, the profitability of his businesses, his ability to live within the budget he set while his case was a Chapter 11 case, his compliance with the Bankruptcy Code and the Bankruptcy Rules, or the feasibility of the Chapter 11 plans he proposed prior to the conversion of his case to Chapter 7.

84.     Because the Plaintiffs sustained their burden of proof to show by a preponderance of the evidence that the false statements made under oath by Mandel in this case were made with a fraudulent intent, the relief sought by the Plaintiffs under §727(a)(4)(A) must be granted.

### D. Objections to Dischargeability

#### 1. Issue Preclusion or Collateral Estoppel

85.     In the alternative, the Plaintiffs seek a judgment denying the dischargeability of Mandel's obligations to them in bankruptcy.  The Plaintiffs' objections to dischargeability are based, in part, on the preclusive effect of this Court's prior orders.

86.     "Collateral Estoppel or, in modern usage, issue preclusion, 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' " *Schiro v. Farley*, 510 U.S. 222, 232 (1994) (quotations omitted).  In other words, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. U. S.*, 440 U.S. 147, 153 (1979) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5 (1979)).  "To preclude parties from contesting matters that they have had a full and fair

opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* at 153–54.

87.     In the bankruptcy dischargeability context, "parties may invoke collateral estoppel in certain circumstances to bar relitigation of issues relevant to dischargeability" and satisfy the elements thereof. *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005) (quotations omitted). In other words, when an issue that forms the basis for the creditor's theory of nondischargeability has been actually litigated in a prior proceeding, neither the creditor nor the debtor may relitigate those grounds. *RecoverEdge, L.P. v. Pentecost,* 44 F.3d 1284, 1294 (5th Cir. 1995). While the doctrine of issue preclusion applies in bankruptcy dischargeability litigation, a bankruptcy court retains exclusive jurisdiction to determine whether a debt is dischargeable. *Grogan v. Garner*, 498 U.S. 279, 284 n. 11 (1991).

88.     With these precepts in mind, the Court turns to the specific objections to dischargeability in these proceedings.

### 2. §523(a)(2)(A): False Pretenses, False Representation, Actual Fraud

89.     The Plaintiffs seek a determination that the debts owed to them should be excepted from discharge pursuant to §523(a)(2)(A) of the Bankruptcy Code.

90.     Section 523(a)(2)(A) provides as follows:

(a)     A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–[12]

>     (2)     for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--[13]

---

[12] The debt arising from fraud includes liabilities arising from the money, property, services or credit. It also includes liabilities such as treble damages, attorney's fees, and other relief sought that may exceed the value obtained fraudulently by the debtor. *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1988).

> (A)    false pretenses, a false representation, or actual
> fraud, other than a statement respecting the debtor's or an
> insider's financial condition

11 U.S.C. §523(a)(2)(A).

91.    To have a debt excepted from discharge pursuant to the "actual fraud" provision

in §523(a)(2)(A), an objecting creditor must prove that:

> (1) the debtor made representations;
> (2) at the time they were made the debtor knew they were false;
> (3) the debtor made the representations with the intention and purpose to deceive
> the creditor;
> (4) the creditor justifiably relied on such representation; and
> (5) the creditor sustained losses as a proximate result of the representations.

*Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v.*

*Mans*, 516 U.S. 59 (1995) (regarding the proper standard of reliance).

92.    In a decision entered on September 30, 2011, this Court found and concluded that

Thrasher, on his own behalf and on behalf of White Nile, and Coleman had established claims

against Mandel for fraud under Texas law.   The Court awarded Thrasher and Coleman their

reasonable attorneys' fees.

93.    The elements required to satisfy a fraud finding under §523(a)(2)(A) are

essentially identical to those required by Texas law.   To establish actual fraud by a debtor under

Texas law, a party must prove that: (1) the debtor made a representation; (2) at the time it was

made, the debtor knew it was false; (3) the debtor made the representation with the intention and

purpose to deceive the creditor; (4) that the creditor relied on such representation; and (5) that the

---

[13]    Under §523(a)(2)(A), it is irrelevant whether the debtor actually received money, property, services, or credit.  The Fifth Circuit has held that a debt is nondischargeable if the debtor benefits *in some way* from the money, property, services, or credit obtained through deception.  *Matter of Luce*, 960 F.2d 1277, 1283 (5th Cir. 1992).

creditor suffered injury as a proximate result of the representation. *See Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex. 2001).

94.     The issues with respect to fraud were actually litigated in connection with the Court's September 30, 2011, decision.   Each issue was necessary to the Court's decision. Therefore, issue preclusion applies, and Mandel's obligations to Thrasher, White Nile, and Coleman are nondischargeable under §523(a)(2)(A).

95.     The attorney's fees award in favor of Thrasher and Coleman "arose from" the same fraud that Mandel is collaterally estopped from disputing and likewise is nondischargeable under §523(a)(2)(A).   *See, e.g., Miller v. Lewis,* 391 B.R. 380, 384–85 (E.D. Tex. 2008); *Fire Safe Protection Servs. v. Ayesh (In re Ayesh),* 465 B.R. 443, 449–52 (Bankr. S.D. Tex. 2011).

96.     Orenstein and MSM also seek a judgment of nondischargeability with respect to their claims.   Their claims arise from Mandel's obligations to them under the agreed receiver order entered by the state court prior to Mandel's bankruptcy.   They argue that Mandel may not discharge his obligations to them, because he entered into the agreed receiver order with no intention of honoring his obligations to them under the order.

97.     Under Texas law, the agreed receiver orders were written agreements and are interpreted as contracts between the parties.   *Threet v. Texas Employers' Insurance Ass'n,* 516 S.W.2d 276 (Tex. Civ. App. — Tyler 1974, no writ).

98.     A contractual promise made with no intention of performing may give rise to an action for fraudulent inducement.   *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

99.     Here, Mandel testified falsely to the state court when he represented that he did not have the ability to pay Orenstein and MSM.   He personally had the ability to pay though his

control of the businesses he owned solely or with his wife. He moved funds around at will depending on where it was needed and who he wanted to pay, and he kept few, if any, accurate records of his business transactions. Mandel did not want to pay Orenstein and MSM – but he had the ability to do so when he entered into the agreed order and afterwards.

100.    Orenstein and MSM also appear to contend that Mandel's obligations to them are not dischargeable, because Mandel engaged in a scheme to drain his companies of assets so that he would not have to pay them, and his scheme constituted "actual fraud" under §523(a)(2)(A). *See Husky Intern. Elecs., Inc. v. Ritz*, ─ U.S. ─, 136 S.Ct. 1581, 1583 (2016).

101.    *Husky* addressed the issue of whether "actual fraud" in §523(a)(2)(A) requires a misrepresentation. In reaching its conclusion, the Supreme Court in *Husky* observed that "'fraud' connotes deception and trickery generally," *id.* at ──, 136 S.Ct. at 1586, and that fraudulent conduct for purposes of actual fraud consists of "the acts of concealment and hindrance," *id.* at 1587.

102.    Here, the demands for payment by Orenstein and MSM were relatively small prior to Mandel's bankruptcy. Mandel simply refused to pay them. He did not tender any payments to Orenstein and MSM except in the shadow of sanctions proceedings before the state court, and he misrepresented his financial condition to Orenstein, MSM and the state court.

103.    The preponderance of the evidence established that Mandel entered into the agreed receiver order without any intent to comply with its requirements. However, it does not appear to this Court that Mandel transferred or concealed assets specifically to avoid their demands for payment.

104.    Because the Plaintiffs sustained their burden of proof to show by a preponderance of the evidence that their claims against Mandel arise from actual fraud, the relief sought by the Plaintiffs under §523(a)(2)(A) must be granted.

### 3. §523(a)(4): Fiduciary Fraud and Larceny

105.    The Plaintiffs' complaints seek a determination that the debts owed to them as determined by the Court should be excepted from discharge under §523(a)(4). [14]

106.    Section 523(a)(4) provides that "[a] discharge under 11 U.S.C.§727 does not discharge an individual from a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

107.    The Fifth Circuit has noted "that this discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (Matter of Miller),* 156 F.3d 598, 602 (5th Cir. 1998) (internal quotations omitted).

### a. Fraud or Defalcation

108.    There are three ways to show that a debt is not dischargeable under §523(a)(4). First, a debt for fraud or defalcation while acting in a fiduciary capacity is not dischargeable in bankruptcy under §523(a)(4).

109.    Whether the actions of an individual were taken in a fiduciary capacity for the purposes of §523(a)(4) is determined by federal law. *Harwood,* 637 F.3d at 620. However,

---

[14] In the Orenstein adversary, Orenstein, as receiver for White Nile, asserts a claim for nondischargeability of Mandel's obligations to White Nile under § 523(a)(4). Her §523(a)(4) claim is duplicative of the claim asserted by Thrasher on behalf of White Nile.

"state law is important in determining whether or not a trust obligation exists." *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta),* 394 F.3d 347, 350 (5th Cir. 2004).

110.    The Fifth Circuit has discussed the concept of a fiduciary under §523(a)(4) in the following terms:

> [T]he concept of fiduciary under §523(a)(4) is narrower than it is under general common law. Under §523(a)(4), "fiduciary" is limited to instances involving express or technical trusts. The purported trustee's duties must, therefore, arise independent of any contractual obligation. The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong. Constructive trusts or trusts *ex* malificio thus also fall short of the requirements of §523(a)(4).
>
> ...Statutory trusts, by contrast, can satisfy the dictates of §523(a)(4). It is not enough, however, that a statute purports to create a trust: A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary." Rather, to meet the requirements of §523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties.

*Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342–43 (5th Cir. 1998).

111.    The Fifth Circuit has recognized that the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law. *Harwood,* 404 B.R. at 393 (citing *LSP Inv. Partnership v. Bennett (In re Bennett),* 898 F.2d 779, 784–85 (5th Cir. 1993)).  However, the trust relationship must exist prior to the creation of, and without reference to, the indebtedness in question.  *Angelle v. Reed (In re Angelle),* 610 F.2d 1335, 1338 (5th Cir. 1980).

112.    Thus, federal courts in this context have "not hesitated to conclude that debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are non-dischargeable." *Gupta,* 394 F.3d at 350.

113.    Accordingly, notwithstanding the "technical" or "express" trust requirement, "state law may create a fiduciary relationship whose breach leads to nondischargeability under §523(a)(4)." *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik),* 670 F.3d 624, 628 (5th Cir. 2012).

114.    With respect to the nondischargeability of attorney's fees, the "status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt.  When the primary debt is nondischargeable … the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, is likewise non-dischargeable." *Matter of Gober*, 100 F.3d 1195, 1208 (5th Cir. 1996).

115.    Here, this Court previously determined that Thrasher, individually and on behalf of White Nile, had established claims against Mandel for breach of fiduciary duty and fraud. Thus, Thrasher and White Nile argue that Mandel's obligation to them is nondischargeable under §523(a)(4), because he engaged in fraud or defalcation while in a fiduciary capacity.

116.    Defalcation does not require fraud or embezzlement, but only willful neglect of duty. *Schwager v. Fallas,* 121 F.3d 177, 182 (5th Cir. 1997).

117.    The Court's prior decision allowing the claims of Thrasher and White Nile against Mandel contains ample findings establishing Mandel's willful neglect of duty to White Nile and Thrasher.  Mandel failed to preserve White Nile's assets, and he took property that belonged to White Nile, among other things.  This Court previously found that Mandel knew that his conduct was wrongful and that Mandel's conduct was intentional and not simply negligent.

118.    The issues relating to the fraud and breach of fiduciary duty were actually litigated in connection with the Court's prior decision.  Each was necessary to the Court's decision.  Therefore, issue preclusion applies.

119.    The Court awarded Thrasher, individually and on behalf of White Nile, his attorneys' fees in its September 30, 2011, decision.  The fees arise from and depend on Mandel's primary debt and are likewise nondischargeable.

120.    Because Thrasher, individually and on behalf of White Nile, sustained his burden of proof to show by a preponderance of the evidence that his claims against Mandel arose from fraud in a fiduciary capacity, the relief he seeks under §523(a)(4) must be granted.

### b. Larceny

121.    Second, debt for larceny is not dischargeable under §523(a)(4).

122.    Here, this Court previously determined that Mandel violated the Texas Civil Theft Liability Act in its decision allowing the claims of Coleman, individually, and Thrasher, individually, for theft or misappropriation of trade secrets.  The Court awarded Thrasher and Coleman compensatory damages as well as their attorney's fees.

123.    The issues relating to the Texas Civil Theft Liability Act were actually litigated in connection with the Court's prior decision.  Each was necessary to the Court's decision.  Therefore, issue preclusion applies.

124.    As an unlawful appropriation of trade secrets for personal use with fraudulent intent, the damages and attorney's fees awarded under the Texas Theft Liability Act satisfy the requirements of larceny so as to render the debts to Coleman, individually, and Thrasher, individually and on behalf of White Nile, nondischargeable under 11 U.S.C. §523(a)(4).  *See Wright v. Minardi,* 536 B.R. 171, 185 (Bankr. E.D. Tex. 2015).

125.    The Court awarded Thrasher and Coleman their attorneys' fees in its September 30, 2011, decision.  The fees arise from and depend on Mandel's primary debt and are likewise nondischargeable.

126.    Because Thrasher, individually, and Coleman, individually, sustained their burden of proof to show by a preponderance of the evidence that their claims against Mandel arose from larceny, the relief they seek under §523(a)(4) must be granted.

### c. Embezzlement

127.    The damages awarded to Thrasher and Coleman under the Texas Theft Liability Act also satisfy the requirements of embezzlement so as to render the debts to Thrasher and Coleman nondischargeable under 11 U.S.C. §523(a)(4).    Under federal common law, embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Miller,* 156 F.3d at 602. Embezzlement is not limited to situations in which one person is entrusted with the property of another.    It also applies where a person lawfully obtains property, but then fraudulently appropriates it for his or her own use. *Id.*

128.    For all of these reasons, the Court concludes that Mandel's obligations to Coleman, individually, and Thrasher, individually and on behalf of White Nile, including their attorneys' fees, are nondischargeable under § 523(a)(4) of the Bankruptcy Code.

### 4. §523(a)(6): Willful and Malicious Injury

129.    Finally, the Court must decide whether the factual determinations established under the principles of issue preclusion satisfy the elements of the Plaintiffs' claims for nondischargeability under §523(a)(6).

130.    Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

131.    The United States Supreme Court has offered its opinion as to what types of debts Congress intended to except from discharge pursuant to §523(a)(6).  In *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998), the Supreme Court stated that:

> [T]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover ..., the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, comment *a*, p. 15 (1964).

The Supreme Court concluded that negligent or reckless acts are not sufficient to establish that a resulting injury is "willful and malicious" and that, therefore, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of §523(a)(6)."  *Id.* at 64.

132.    In *Miller v. J. D. Abrams, Inc. (In re Miller)*, 156 F.3d 598 (5th Cir. 1998), the Fifth Circuit analyzed the *Geiger* ruling in an effort to articulate a methodology by which to distinguish between acts intended to cause injury as opposed to those merely leading to injury. The *Miller* court determined that a "willful ... injury" is established under §523(a)(6) when there exists either: (1) an objective substantial certainty of harm arising from a deliberate action or (2) there is a subjective motive to cause harm by the party taking a deliberate or intentional action. It further determined that the standard for determining the existence of a "willful" injury under *Geiger* had subsumed the Circuit's former standard for determining "malicious" conduct under §523(a)(6) (*i.e.*, "without just cause or excuse") and had eliminated any need to conduct a separate analysis on that malice element. *Id.* at 604–06.

133.   The "objective substantial certainty" prong "is a recognition of the evidentiary reality that a defendant in a bankruptcy context rarely admits any prior action was taken with the intent to cause harm to anyone. A court is thus expected to analyze whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to cause harm, are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff." *Mann Bracken, LLP v. Powers (In re Powers)*, 421 B.R. 326, 334–35 (Bankr. W.D. Tex. 2009) (citing *Berry v. Vollbracht (In re Vollbracht)*, 276 Fed.Appx. 360, 362 (5th Cir. 2007)0.

134.   This Court previously found that Mandel misappropriated the intellectual property created by Thrasher and Coleman.  He misappropriated their intellectual property for the benefit of NeXplore and, ultimately, himself, while at the same time ensuring that Thrasher and Coleman could not benefit from the intellectual property they had developed.  This clearly meets the requirement of an objective substantial certainty of harm.  Thus, the compensatory damages and attorney's fees obtained by Thrasher and Coleman are not dischargeable.

135.   For all of these reasons, the Court concludes that Mandel's obligations to Coleman, individually, and Thrasher, individually, including their attorneys' fees, are nondischargeable under §523(a)(6) of the Bankruptcy Code.

136.   In addition, Orenstein argues that Mandel's obligation for her fees and the fees of her counsel, MSM, are nondischargegable, because Mandel needlessly prolonged the litigation giving rise to their fees.

137.   The Fifth Circuit has held that presenting frivolous claims and engaging in deliberate and needlessly prolonged litigation is sufficient injury for purposes of §523(a)(6). *See In re Keaty,* 397 F.3d at 264.  In *Keaty*, the wrongful conduct alleged against the debtor included

knowingly filing a suit without foundation and "crafted for the purpose of harassment." 397 F.3d at 274. The Fifth Circuit determined that the debtor's actions in that case were "designed to deliberately prolong the proceedings unnecessarily"—an objective that was "substantially certain to injure [plaintiff], since deliberately and needlessly prolonging the proceedings would necessarily cause [plaintiff] financial injury." *Id.*

138. Here, Mandel is litigious by his own admission. He engaged in litigation tactics that the state court found unacceptable and sanctioned. However, Orenstein and MSM failed to show that Mandel's litigious conduct, with respect to them, rises to a level that would justify a judgment of nondischargeability. Mandel has not won every argument, objection, or appeal, but his arguments and objections have not been entirely without foundation.

139. Because Orenstein and MSM failed to sustain their burden of proof to show by a preponderance of the evidence that their claim arose from willful and malicious injury by Mandel, their claim for nondischargeability under §523(a)(6) must be denied.

## V. CONCLUSION

For all of these reasons, the Court concludes that the Plaintiffs' objections to Mandel's discharge should be sustained in part and denied in part as follows.

• The Plaintiffs' §§ 727(a)(2)(A) and (a)(3)(B) objections to Mandel's discharge are DENIED.

• The Plaintiffs' §§ 727(a)(3) and (a)(4) objections to Mandel's discharge are SUSTAINED.

• The objections of Thrasher, individually and on behalf of White Nile, and Coleman to the dischargeability of Mandel's obligations to them, including their attorneys' fees under §§ 523(a)(2)(A) and (a)(4) are GRANTED.

65

- The objections of Thrasher and Colman to the dischargeability of Mandel's obligations to them, including their attorneys' fees, under §523(a)(6) is GRANTED.

- The objection of Orenstein and MSM to the dischargeability of Mandel's obligations to them under §523(a)(2)(A) is GRANTED.

- The objection of Orenstein and MSM to the dischargeability of Mandel's obligations to them under §523(a)(6) is DENIED.

The Court will enter a separate judgment consistent with these findings of fact and conclusions of law.  To the extent any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  Likewise, to the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.  The Court may make additional findings as necessary or as requested by any party.

Signed on 03/31/2017

*Brenda T. Rhoades*    SD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

66